[No. 3,525.]

## CHRISTOPHER GREEN AND CHARLES TRAINOR v. CHARLES H. SWIFT, CHARLES CROCKER, JOHN ROONEY, W. A. JOHNSON, WILLIAM F. KNOX, AND H. T. HOLMES.

POLICE POWER OF THE STATE.—It is within the Police power of the State to authorize the channel of a river to be turned or straightened, in order to protect from threatened inundation a populous portion of the State, and such work is of a public character.

IDEM.—In such case, the authority of the State is none the less in degree, even if the inhabitants of the district of country to be protected did not constitute a body politic or corporate.

BED OF A RIVER A PUBLIC HIGHWAY.—The bed of a river is a public highway of the State, and within its absolute control, subject only to the rights of commerce.

DAMAGES FOR ACTS DONE BY AUTHORITY OF LAW.—A Board of Commissioners, appointed by an Act of the Legislature, with power to turn or straighten the channel of a river, in order to protect a populous portion of the country from threatened inundation, are not liable for damages to others caused by the work, resulting from mere errors of judgment in the Commissioners, provided they keep within the scope of their powers, and exercise their judgment honestly, and do not act maliciously, oppressively, or arbitrarily.

TAKING LAND FOR PUBLIC USE.—If an Act is passed authorizing the channel of a river to be turned or straightened where it empties into another river, and the performance of the work causes the current of the river emptying into the other to destroy land on the opposite side of such other river, the damage thus sustained is not taking land for public use, and the Act is a sufficient defense to an action brought to recover such damages.

APPEAL from the District Court, Sixth Judicial District, County of Sacramento.

The facts are stated in the opinion.

*Edgerton & Harrison,* for the Appellants.

Under the provision of the Act of April 9th, 1862, which authorized the Commissioners " to turn or straighten any portion of the channel of the American River deemed necessary for the protection of the city," their functions were both ministerial and *quasi* judicial. To the extent of determining that it was necessary to change the channel for

the protection of the city, their act was *quasi* judicial; and it is not claimed that they would be liable for an error of judgment in this particular. But all their acts relating to the manner in which the change should be effected were ministerial; and in the performance of these acts, they were bound to the exercise of proper care and skill, in order that injury might not result to others. (Sherman & Redfield on Negligence, Sections 156, 161, 165; *Rochester White Lead Co.* v. *Rochester*, 3 N. Y. Rep. 463.)

The evidence establishes the following facts:

That the rise of the American river always precedes that of the Sacramento.

That its rise is sudden, and that, in time of a flood, its waters rush down to the Sacramento in great volume, and with overwhelming force.

That the Levee Commissioners changed the channel of the American river, in such a manner as to make it at right angles with the Sacramento; whereby the waters of the former were plunged directly across the latter, upon the plaintiff's premises.

It is claimed by the appellants, that, in view of the turbulent character of the American river, and of the fact that its rise invariably precedes that of the Sacramento, the manner in which the new channel was cut, viz, at right angles to the Sacramento River, thereby throwing the waters of the former directly across the latter, upon the plaintiff's premises, and destroying their property in the manner complained of, constitutes a *prima facie* case of negligence and unskillfulness on the part of the Levee Commissioners, for which they are liable.

The Levee Commissioners were not public officers, charged with the execution of a public trust. The public had no interest in the performance of the act complained of. · Upon principle, the case is precisely as if a private individual, or a private corporation not for a public use, were authorized by a statute to do an act solely for its own protection; the direct and inevitable consequence of which would be an irreparable injury to another. In such case, it would not be seriously contended that the authority of

the statute would shield the person committing the act from responsibility, whether it were the person for whose benefit the act was authorized, or some other person, designated by the statute to perform it in his behalf. Correctly stated, this would be an attempt to legalize the destruction of private property for the protection of other private property; the ruin of one private citizen for the benefit of another private citizen; the destruction of one community of citizens to save another community of citizens; and all this without compensation to the parties injured.

*Robert Robinson* and *Beatty & Denson*, for Respondents.

Whatever acts the Levee Commissioners did in the premises, they did under the authority of a legislative enactment. It is not pretended that there is any evidence showing that they violated the law under which they were acting in any particular. On the contrary, they strictly followed the letter of the law. There is no proof of any malice or unskillfulness. He who acts under the provisions of a legislative enactment, so long as he follows the letter of the law, is protected from all suits and actions at law.

By the Court, WALLACE, C. J.:

The plaintiffs are owners of certain premises situate upon the western bank of the Sacramento river, in the county of Yolo. The American river is a comparatively short stream, having its sources at a high altitude in the mountains, and running at a generally steep grade to the point of its confluence with the Sacramento river on the eastern shore of the latter river; and prior to the year 1862 the point of confluence was to the southerly of the premises of the plaintiffs. In periods of protracted rain storms it rises much more rapidly than the Sacramento river does, but the force of its current, at its point of confluence with the latter river, was somewhat controlled by the circuitous natural channel it followed in approaching the latter river, and the premises of the plaintiff, being situate on the Yolo shore considera-

bly to the northward of the point where the American river emptied into the Sacramento river, were not injured by the current of the former river. But in its sweep to the southward on the Sacramento shore, and before debouching into the Sacramento river, the volume and violence of the American river in protracted rain-storms was so great as to imperil the safety of the city of Sacramento, of which city it formed one of the corporate limits; and to provide security against its threatened overflow, an Act of the Legislature was passed in April, 1862, (p. 151), by which the defendants Swift, Crocker, Knox and Holmes were constituted a Board of " City Levee Commissioners," and empowered " to turn or straighten the channel of any portion of the American river deemed necessary for the protection of the city." The Board and the defendants, Rooney and Johnson, employed by the Board as contractors to do the work, straightened the channel of the American river, making it approach the Sacramento river directly and at right angles, and thereby accelerating its current in emptying into the latter stream. The point of debouchment into the Sacramento river was by this means changed from below to above, and nearly opposite to the premises of plaintiffs, on the Yolo shore, and in December, 1867, the waters of the American river poured into and across the channel of the Sacramento river, upon and against the premises of the plaintiffs, on the opposite shore, with such force and volume as to wash away land and improvements thereon, and destroy hogs, cattle and other property to the value of several thousand dollars, and this action is brought to recover of the defendants the damages sustained by the plaintiffs in the premises, and the latter, having been nonsuited at the trial, bring this appeal.

1. The work which was directed by the statute was, in itself distinctively a work of a public character, and within the general police power of the State to perform. It was designed to protect a populous and important district of the State from threatened inundation and apprehended destruction. It is of no consequence upon this point, whether the city of Sacramento, which was to be protected, had at that

time a corporate existence or not—the authority of the State in the premises was none the less in degree, even if the inhabitants of the district of country to be protected "did not in any sense constitute a body politic or corporate."

2.　The means by which the protection was to be secured was the draining of the waters of the American river, in a more direct and rapid manner into the Sacramento river, which, as being one of the public highways of the State, was within its absolute control—subject only to the rights of commerce.

3.　There is no question that the work, as done by the defendants, was in point of execution done with proper care and skill. The power was, in terms, given them by the statute "to turn or straighten the channel of any portion of the American river, deemed necessary for the protection of the city." It is not pretended, indeed, that they have not straightened it. One, in fact the main, ground of complaint is, that they have made it straight, or nearly so, and that it enters the Sacramento river at right angles to that stream. But the propriety of this, under existing circumstances, was a matter confided by the sovereign to the better judgment of the Commissioners themselves, and they were directed to turn and straighten the channel, or any part of it "deemed necessary for the protection of the city." They were to exercise their judgment honestly, and to do the work, of course, with proper care and caution, and not maliciously, oppressively or arbitrarily, to the injury of the rights of other persons. But, keeping within the scope of these powers, they are not to be held for mere errors of judgment, nor for injuries to others resulting from the work itself, if properly performed and with due care. Otherwise, as remarked by Lord Kenyon, every statute of this character "would give rise to an infinity of actions." (*Governor, etc.* v. *Meredith,* 4 Term R. 796.)

4.　And on looking into the evidence submitted by the plaintiffs at the trial, we see no attempt to impugn the good faith of the defendants in making the junction of the two rivers at the point selected, or their skill in the mechanical execution of the work itself. It is true that Mr. Mathews,

the civil engineer from Grass Valley, is of opinion that "the natural and inevitable effect of the change in the channel of the American river, and turning it into this canal, was to throw the waters of the American river directly across the Sacramento river upon the opposite bank." This may be so, and of course easily to be seen after the event has actually happened; but if, at the time the work was projected and put into execution, it was foreseen, or at all apprehended by any person, even the plaintiffs themselves, or others on the Yolo shore, that such results would follow, the records fails to show the fact. After all, the damage would seem to have directly resulted not so much from the mere force with which the waters of the American river were immediately thrown upon the Yolo shore, as from the after current and "undertow" running down the western shore of the river—spoken of by witness Hoagland.

5. It is lastly argued by the counsel for the plaintiffs, that the destruction of the property of his clients, occurring in consequence of the execution of this work, was a taking of that property for public use within a constitutional sense, and that no compensation therefor having been provided by the Act under which the defendants proceeded, it follows that the Act in question "is inoperative as a defense to this action." On recurring to the Act, however (Section 6,) it is seen that proper provision is made for the taking of such lands in the city of Sacramento, or in the county of Sacramento, as "may be necessary and proper to turn or straighten the channel of the American river." And we are of opinion that the destruction of the property of plaintiffs on the opposite bank of the Sacramento river, as a mere consequence of the impinging of the current of the American river, caused by this purely public work, is not a taking of such property entitling the plaintiffs to receive compensation as for property taken for public use. "If" (says Judge Cooley, referring to the eminent domain) "for instance, the State, under its power to provide and regulate the public highways, should authorize the construction of a bridge across a navigable river, it is quite possible that

all proprietary interests in land upon the river might be injuriously affected; but such injury could no more give a valid claim against the State for damages than could any change in the general laws of the State, which, while keeping in view the general good, might injuriously affect particular interests" (Const. Lim. 541); and in support of this view, he refers to the opinion and judgment of the Supreme Judicial Court of Massachusetts, in a case in which it appeared, that by reason of the construction of a railroad across the mouth of a creek, upon which the mill of the petitioners was situate, the flow of the tide-water into the mill-dam had been obstructed and prevented to such a degree that the mills of the petitioners could not be worked as effectually as before. The Court, however, was of opinion that such an obstruction to the flow and reflow of the tide-waters was without legal objection, "and," said Mr. Chief Justice SHAW, in delivering its opinion, "if the mill-owner or coterminous proprietor suffers in consequence, it is *damnum absque injuria.*" (*Davidson* v. *Boston and Maine Railroad,* 3 Cush. 91.) I am, therefore, of opinion that the Act of the Legislature furnishes a sufficient defense to this action, and that, without noticing other points made for the defendants, the judgment and order denying a new trial should be affirmed, and it is so ordered.

Neither Mr. Justice RHODES, nor Mr. Justice CROCKETT, expressed an opinion.