[No. 12094. In Bank. — July 2, 1887.]

E. R. THOMASON, APPELLANT, v. THOMAS ASH-WORTH, RESPONDENT.

STREET IMPROVEMENTS — ACTS PROVIDING FOR — REPEAL OF — SAN FRANCISCO — CONSTITUTIONAL LAW. — The act of April 1, 1872, providing for the improvement of streets in the city and county of San Francisco, in so far as it authorized a contract for street improvements to be entered into in advance of the assessment and collection of the money to be paid for the work done under it, was repealed by section 19 of article 11 of the constitution of 1879, and was afterwards entirely repealed by the act of March 6, 1883, providing for the improvement of streets, lanes, alleys, courts, places, and sidewalks, and the construction of sewers

within municipalities. This latter act was repealed by the act of March 18, 1885, on the same subject.

ID. — AMENDMENT OF CONSTITUTION. — *Oakland Paving Company* v. *Tompkins*, 72 Cal. 5, affirmed on the point that section 19 of article 11 of the constitution of 1879, providing that no contract for street work should be made until after the assessment therefor had been levied, collected, and paid into the city treasurer, was repealed by the constitutional amendment proposed by the legislature in 1883, and adopted by the people at the general election in 1884.

ID. — GENERAL STREET LAWS — LEGISLATURE HAS POWER TO ENACT. — The acts of March 6, 1883, and of March 18, 1885, are general laws, within the meaning of section 6 of article 11 of the constitution, affecting all municipal corporations in the state, and were within the power of the legislature to enact. The latter act has been and is now in force in the city and county of San Francisco since the date of its passage.

ID. — CHARTER OF MUNICIPALITY MAY BE AFFECTED BY GENERAL LAW. — Under section 6 of article 11 of the constitution, the legislature has power to pass a general law affecting the charter of the city and county of San Francisco, without the consent of such city and county.

APPEAL from a judgment of the Superior Court of the city and county of San Francisco.

The facts are stated in the opinion of the court, and in the dissenting opinion of Justice McKinstry.

*John F. Swift, J. C. Bates,* and *J. M. Wood,* for Appellant.

*George Flournoy, Jr.,* and *Thomas V. O'Brien,* for Respondent.

THORNTON, J.—Application for writ of mandate to the defendant as superintendent of streets, commanding him to enter into and sign a contract under the street law for the city and county of San Francisco, passed April 1, 1872.

The contract, the execution of which is sought to be compelled herein, is one to be entered into in advance of the assessment and collection of the money to be paid for the work done under it, under the provisions of the act of 1872, and in this regard this act may be held to be done away with by the provisions of the constitu-

tion.   This we consider as settled in this court by the cases of *McDonald* v. *Patterson*, 54 Cal. 245, and *Donahue* v. *Graham*, 61 Cal. 277.

Since the adoption of the constitution, and on the 6th of March, 1883, the legislature enacted an act entitled "An act to provide for the improvement of streets, lanes, alleys, courts, places, and sidewalks, and the construction of sewers within municipalities." (Stats. 1883, p. 32.) This act was passed in conformity with the portion of section 19 of article 11 of the constitution relating to works on and improvement of streets, which is quoted in the opinion of the court in *McDonald* v. *Patterson, supra*, and repealed all acts or parts of acts in conflict with any of its provisions. (See section 36 of act above cited, Stats. 1883, p. 47.) Thus, such parts of the act of 1872 which remained in force after the adoption of the constitution as are in conflict with the act of 1883 were repealed by it.

Subsequently, and on the eighteenth day of March, 1885, a statute was passed and approved with a title substantially the same as that of the act of 1883. (Stats. 1885, p. 147.) By the thirty-sixth section of this act, the act of 1883 was repealed, except as to work commenced under it prior to the passage of the repealing act. (Stats. 1885, p. 165.)

The last-named act like the act of 1872 did not provide for the assessment and collection of the money to pay for the street work done under it until after the work was completed.   And in this respect it was violative of section 19 of article 11 of the constitution, as that section was originally passed.   But according to the ruling of this court in *Oakland Paving Company* v. *Tompkins*, 72 Cal. 5, the section of the constitution above mentioned had been amended before the act of 1885 was passed, by which the objection of unconstitutionality to the latter act, on the ground that it was violative of the section referred to, was removed.   We consider the decision in the

case just above cited as settling finally the question as to the constitutionality of the amendment of section 19, above referred to.

But there is another objection urged to the constitutionality of the acts of 1883 and 1885. It is argued that, under section 6 of article 11 of the constitution, neither of the acts above mentioned could become laws, for the reason that they are special laws, and therefore beyond the power of the legislature to enact, and further, that the legislature did not have the power to pass a general law affecting the charter of the city and county of San Francisco without the consent of such city and county.

The sixth section of article 11 of the constitution is as follows:—

"Sec. 6. Corporations for municipal purposes shall not be created by special laws; but the legislature, by general laws, shall provide for the incorporation, organization, and classification, in proportion to population, of cities and towns, which laws may be altered, amended, or repealed. Cities and towns heretofore organized or incorporated may become organized under such general laws whenever a majority of the electors voting at a general election shall so determine, and shall organize in conformity therewith; and cities or towns heretofore or hereafter organized, and all charters thereof framed or adopted by authority of this constitution, shall be subject to and controlled by general laws."

The entire legislative power is by the constitution vested in the senate and assembly, designated as the legislature. Any restriction of this power must be found in the constitution of the state, or in the constitution of the United States and laws passed in pursuance thereof. Our attention has been called to no restriction in the constitution of the United States or the acts of Congress in regard to the question to be herein considered. The restrictions in the sixth section of article 11 are as follows: 1. Corporations for municipal pur-

poses can only be created by general laws. Prior to the adoption of the present constitution, the legislature could create a corporation for municipal purposes by a special law. This cannot be done since the present constitution became operative. 2. Prior to the adoption of the present constitution, the legislature was not only competent to create a corporation for municipal purposes by a special law, but could compel a community of persons to accept a charter so created. As the constitution now stands, and since its adoption, a corporation can determine by a vote of its electors whether to accept a new charter or not, and such new charter or organization is accepted only when voted for by a majority of its electors voting at a general election. 3. A charter cannot be amended by a special law. But while these restrictions exist, the legislature has the power to control the charters of all corporations by general laws. The restrictions above pointed out do not at all affect the power to control or regulate the charters of all municipal corporations by laws general in their character. This power is expressly recognized by the last clause of section 6, above cited, where it is declared that " cities and towns heretofore or hereafter organized, and all charters thereof framed or adopted by authority of this constitution, shall be subject to and controlled by general laws."

On reading the constitution it will be observed that its framers were particularly careful to restrict the legislature from passing local or special laws. See article 4, section 25; article 11, sections 4, 5, 11, 12, 14; article 12, sections 1, 5, 11; and section 11 of article 10, where legislative powers are conferred on counties, cities, towns, or townships by the constitution, such powers are still made subject to and liable to be controlled by general laws.

So it will be observed that the meaning attributed to the last clause of section 6 of article 11 is in accordance with the general plan on which the constitution is framed,

that is, the inhibition of special or local legislation, and the allowance of general legislation. Evils constantly arise from special legislation, and such evils it was the intention of the constitution-makers to prevent. The evils of general legislation are such as spring from the imperfection of all things human and the abuse of power, but the abuse, or liability to abuse, affords no argument against the existence of such power.

To prevent such abuses, reliance must be had on the intelligence and fidelity of the representatives of the people, their accountability to their constituents, and the power to repeal statutes when found to be hurtful.

The acts of 1883 and 1885 include all municipal corporations in the state. This plainly appears from the first section of each act. Is it not, then, a general law? As the foregoing statutes apply to all municipal corporations in the state, if they are not general laws it would be impossible to frame one which is general. The above view as to a general law accords with *Brooks* v. *Hyde,* 37 Cal. 376; *Wheeler* v. *Philadelphia,* 77 Pa. St. 338; *Kilgore* v. *Magee,* 85 Pa. St. 401; *Knickerbocker* v. *People,* 102 Ill. 218; *Hymes* v. *Aydelott,* 26 Ind. 431; *Chicago R. R. Co.* v. *Iowa,* 94 U. S. 155; *McAunich* v. *Mississippi etc. R. R. Co.,* 20 Iowa, 343. In *Knickerbocker* v. *People, supra,* it is said: "A law applicable to all counties of a class, as made or authorized by the constitution, is neither a local nor a special law. If it applies to all the counties of a class authorized by the constitution to be made, it is a general law, and whether there may be few or many counties to which its provisions will apply is a matter of no consequence." It is said in *Wheeler* v. *Philadelphia,* above cited: "A statute which relates to persons or things as a class is a general law."

It is argued that, according to the views herein expressed, a city may have its charter totally changed without its consent. This is a proper deduction from the ruling herein, but this cannot be done by a special

or local law applicable alone to a particular charter. The result can only be reached by a general law affecting all municipal corporations, or may be all of a class, and we can see no probability that a city can be injured by general legislation. When such legislation is allowed, corporations are put on the same footing with individuals as to protection against special or local legislation, and liability to be affected by general legislation. Whatever the danger may be from such legislation, the constitution is so written as to allow it, and thus we must interpret it.

It follows from the above,—1. That the act of 1872 was entirely done away with by the constitution; 2. That the act of 1883 was constitutional when passed, and repealed all portions of the act of 1872 in conflict with it; 3. That the act of 1885 is a constitutional act under the constitution as amended; that the act of 1885 repealed the act of 1883, and has been, and is now, in force since its passage on the eighteenth day of March, 1885.

The judgment must be affirmed.

So ordered.

SEARLS, C. J., McFARLAND, J., and PATERSON, J., concurred.

McKINSTRY, J., dissenting.—1. I dissent. Section 19 of article 11 of the constitution of 1879–80 (as the same stood prior to its amendment) reads:—

"No public work . . . . shall be done or made, in any city, in, upon, or about the streets thereof, . . . . the cost and expense of which is made chargeable *or* may be assessed upon private property by special assessment, unless an estimate of such cost and expense shall be made, and an assessment, in proportion to the benefits on the property to be affected or benefited, shall be levied, collected, and paid into the city treasury, before such work or improvement shall be commenced,

or any contract for letting or doing the same authorized."

I have heard or read no argument which ought to induce a modification of my views with respect to the non-effect of the provision of the constitution above quoted upon the "street law" of 1872, the same being part of the "consolidation laws" of San Francisco. I adhere to the views expressed in the dissenting opinion in *Donahue* v. *Graham,* 61 Cal. 276, and still believe the provision of the constitution prohibits the *legislature,* created by the constitution,—in any general law for the future organization of municipal corporations, passed in pursuance of the mandate in the first sentence of section 6, article 11,—from enacting that public improvements may be made or street work done until after the cost shall have been estimated and assessments therefor levied and collected. The prohibition also extends to provisions for street work, without previous assessment, in any charter framed for San Francisco in the manner laid down in section 8, article 11.

Nor is this court estopped from reconsidering the question passed on in *Donahue* v. *Graham.* The conditions which would seem to prevent a review of *Green* v. *Swift,* 47 Cal. 536, were more formidable than any obstacles herein apparent to a reconsideration of *Donahue* v. *Graham.* A change in the constitution had extended and enlarged the provision prohibiting. the taking of private property for public use without compensation. *Green* v. *Swift* did not purport to construe the meaning of a constitutional clause ("private property shall not be *damaged* without due compensation," etc.), which did not then exist; the decision applied only to events which occurred prior to the enactment of that clause, and it was made by the Supreme Court, which expired with the constitution that gave it life, and whose provisions it interpreted. Except as to the parties in interest, no consequence of the judgment in

*Green* v. *Swift* flowed this side of the adoption of the present constitution. Yet in *Green* v. *State, ante,* p. 29, this court again inquired into the meaning of a section of the defunct constitution, which in *Green* v. *Swift* had been construed by the appellate tribunal created by that constitution.

No property rights could have grown up under the judgment in *Donahue* v. *Graham.* Surely there is no judicially recognized application of the doctrine of *stare decisis* which precludes us from returning to the true interpretation of a provision of the constitution (set aside and annulled by the people and the people's representatives since the decision in *Donahue* v. *Graham,* and perhaps because of that decision), and by the misinterpretation of which, by this same court, we have been led into the grave dilemma that we are called on to hold,—either that there is no law for the reparation of streets in the great city of San Francisco, or that the legislature may change the entire chartered government without the consent of the people of the city and county.

Moreover, section 19 did not, in terms, purport to repeal any part of the charter of a city previously existing, nor did it supply a method of estimating the cost of street work within a city, or of assessing private property therefor. The constitution, even if self-operating, only prohibited in the future the letting of a contract for or the commencement of a public work or improvement, unless, etc. It might be argued, plausibly at least, that the prohibition was pointed at future action under a charter, and did not repeal the portion of the charter which originally authorized such action. No portion of the charter having been repealed when the constitutional prohibition ceased, by reason of its repeal street work could be proceeded with in the manner prescribed in the charter. (*Board of Commissioners of the Funded Debt* v. *Board of Trustees,* 71 Cal. 310.)

2. Sections 6 and 8, article 11, of the constitution read as follows:—

"Sec. 6. Corporations for municipal purposes shall not be created by special laws; but the legislature by general laws, shall provide for the incorporation, organization, and classification, in proportion to population, of cities and towns, which laws may be altered, amended, or repealed. Cities and towns heretofore organized or incorporated may become organized under such general laws whenever a majority of the electors voting at a general election shall so determine, and shall organize in conformity therewith; and cities or towns heretofore or hereafter organized, and all charters thereof framed or adopted by authority of this constitution, shall be subject to and controlled by general laws."

"Sec. 8. Any city containing a population of more than one hundred thousand inhabitants may frame a charter for its own government, consistent with and subject to the constitution and laws of this state, by causing a board of fifteen freeholders . . . . to be elected, . . . . whose duty it shall be . . . . to prepare and propose a charter for such city. . . . . Such proposed charter . . . . shall be submitted to the qualified electors of such city at a general or special election, and if a majority of such qualified electors voting thereat shall ratify the same, it shall thereafter be submitted to the legislature for its approval or rejection as a whole, *without power of alteration or amendment,* and if approved by a majority vote of the members elected to each house, it shall become the charter of such city, or if such city be consolidated with a county, then of such city and county. . . . . The charter so ratified may be amended at intervals of not less than two years, by proposals therefor, submitted by legislative authority of the city to the qualified voters thereof, . . . . and ratified by at least three fifths of the qualified electors voting thereat, and

approved by the legislature, as herein provided for the approval of the charter."

The mandate that general laws shall be passed under which corporations may be formed is of modern date. The provision in state constitutions requiring such laws and prohibiting special charters was manifestly inserted to prevent abuses, which experience had proved clung about the legislative practice of creating corporations and granting franchises by special act. Bouvier says of legislative charters of corporations that a charter is an act of the legislature creating a corporation. Strictly speaking, a general law under which they may be formed does not *create* the corporations; it provides the mode by which they may subsequently be brought into being. After a corporation is formed, the general law may not improperly be said to be the charter defining its powers, but the legislature does not confer the franchise directly upon individuals or on the community; it is derived indirectly through the subordinate agency of the corporators themselves. The distinction is immaterial, except as it may aid to explain the last clause of section 6, article 11, of the constitution. It might seem at first glance that "charters framed by authority of this constitution" are spoken of as things different from "cities and towns hereafter organized." But the only section of the constitution which speaks in those terms of *framing charters* is section 8, article 11, which provides for the election of fifteen freeholders to frame a charter for San Francisco,—the city in the state containing more than one hundred thousand inhabitants. It would appear the clause as to "all charters framed," etc., was inserted *ex abundanti cautela*, lest it may possibly be supposed that by framing a charter, and securing its approval by the legislature, the people of San Francisco could remove themselves beyond the control of the general laws of the state. Moreover, all cities and towns organized prior to the adoption of the present constitution, and in a cer-

tain sense all organized afterwards, were or will be created by charter. The terms " cities and towns organized " and " city or town charters " may be used interchangeably, and are used in the last clause of section 6, article 11, as designating the same thing. That clause may be read " and cities and towns heretofore or hereafter organized shall be subject to and controlled by general laws,"—the words " and all charters thereof framed or adopted by authority of this constitution " being omitted, as not actually modifying the sense.

3. I.do not understand it to be seriously disputed that the " street law " of 1872 constituted a very material portion of the charter of San Francisco, as the same existed when the present constitution was adopted. An independent act creating commissioners to fill up sloughs within the limits of a city, and an act creating park commissioners, have been held to be corporations for municipal purposes. (*St. Louis* v. *Shields,* 62 Mo. 274; *People* v. *Salomon,* 51 Ill. 37.) Municipal improvements, including work done " upon, in, or about " the streets, are matters peculiarly within the province of the city government, and have been so treated and considered. Provisions for street work, to be based on municipal ordinances, and done under the supervision of a street superintendent elected by the qualified voters of the city and county, were inserted in the act to repeal the several charters of the city of San Francisco, to establish the boundaries of the city and county of San Francisco, and to consolidate the government thereof, approved April 19, 1856, and in amendments thereof enacted prior to the act of April 1, 1872,—the last act being itself amendatory of the consolidation act and its previous amendments.

Nor do I understand it to be at all disputed that the street law, so called, of 1885 (supposing that law to be a substitute for the street law of 1883, and the charter provisions as to street work in San Francisco to have been

in force after the adoption of the constitution of 1879, or after the repeal of the first sentence of section 19, article 11, of the constitution), does annul the material portion of the charter of San Francisco relating to work upon streets.

On the 13th of March, 1883 (seven days after the approval of the act "to provide for the improvements of streets, etc., within municipalities"), an act was approved, entitled "An act to provide for the organization, incorporation, and government of municipal corporations." The last act is a general statute, providing for the incorporation, organization, classification, and government of cites and towns, and was unquestionably intended to be a compliance with the mandate of the first clause of section 6, article 11, of the constitution. It provides for the election of a superintendent of streets, and prescribes his duties, which are such as the title of his office would imply. Amongst the powers of the municipal council is enumerated the power of opening, altering, constructing, repairing, etc., streets, highways, etc., and in subsequent sections is supplied an entire scheme for "street work." If both these statutes were valid, the provisions of the act of March 13 were substituted for those of the act of March 6, 1883,—at least so far as street work done in cities and towns organized under the act of March 13 is concerned. This would leave the act of March 6, 1883, operative, if operative at all, only within municipalities organized prior to the present constitution; that is, a law claimed to be "general," because operative upon and within all cities and towns, is operative only upon and within some cities and towns. Will it be contended that the act of March 6, 1883, was intended to apply *only* to San Francisco, and other cities or towns organized prior to the taking effect of the present constitution? Or that, after it was repealed as to corporations subsequently organized, it continued in force as to those organized previously?

At all events, the passage of the act of March 13, 1883, was clearly a legislative recognition that the matter of the construction and repair of streets, alleys, etc., constituted a proper part of the organized government of cities and towns.

4. But the act of 1885 was an amendment of the act of March 13, 1883, or an entire revision and consequent repeal of those provisions of that act relating to "work upon streets, alleys," etc., within municipalities formed under the general law. If a general law at all, it was a general law because a law amending a general law for the incorporation, organization, and classification of cities and towns, passed in conformity with section 6, article 11, of the constitution. It was a substitution of one system of street work for another system. If operative at all, it made an end of the provisions of the general law of 1883 relating to street work. Even if there can be no repeal by implication under the present constitution,—and it has not been so decided,—yet a statute which, to be of force, must be held to have done away with a former statute cannot be sustained as operative, while at the same time it is held not to amend, revise, or repeal the former statute because not passed in the manner or with the forms required by section 24, article 4, of the constitution. If the failure to comply with the forms of that section has any effect, its effect is to render the last statute invalid.

Considering the act of 1885 as an amendment or revision and repeal of the act of March 13, 1883, so far as relates to street work, it would be a strange result if, while the general law of March 13, 1883, could not be made operative within the city of San Francisco without the consent of the citizens, expressed in the manner provided in section 6, article 11, of the constitution, the law amending and revising the general law became at once binding upon the city and citizens.

5. As we have seen, when, if ever, the city of San

Francisco shall organize in pursuance of a charter framed and adopted in the manner prescribed in section 8, article 11, of the constitution, it will be a city organized after the adoption of the constitution, and will be "subject to and controlled by general laws." (Article 11, section 6.)

Now, the words "general laws" in the last clause of section 6, whether applied to cities organized before the constitution was adopted or organized afterward, *must mean precisely the same thing.*

Observe how carefully the constitution has guarded against legislative interference with any charter which shall be adopted in the manner provided in section 8. Such a charter (which by section 6 will undoubtedly "be subject to and controlled by general laws,"— whatever the phrase may mean) can only be amended "at intervals of not less than two years"; each amendment must be submitted to the local electors, and must be ratified "by at least three fifths of the qualified voters." To become operative, it must then be approved by a majority of all the members of the legislature "elected to each house."

Verily, if a new charter, which may be adopted for San Francisco by San Francisco, can be amended out of existence by statutes passed in the legislature by a majority composed in no part of members representing San Francisco,—as it may be if the present charter can be so amended,—the laborious effort of the constitution-makers to prohibit amendments, except with the consent of three fifths of the qualified electors of the city, have been of very little avail. With all respect, such a result seems to me *reductio ad absurdum.*

6 The act of 1885 "to provide for work upon streets, etc. in municipalities," if a general law in any sense, is a general law changing in essential particulars the governmental organization of the municipal corporation known as the city and county of San Francisco. "Cities

and towns heretofore organized may become organized under such general laws [those commanded in the same section] whenever a majority of the electors voting at a general election shall so determine, and shall organize in conformity therewith." (Constitution, art. 11, sec. 6.) If anything is due to the strongest implication, the general laws under which municipal corporations may be formed cannot be made applicable to San Francisco without the consent of the citizens. They cannot be enforced *anywhere* except upon communities which shall first voluntarily subject themselves to them.

In *Desmond* v. *Dunn*, 55 Cal. 242, this court held that the charters of cities and towns created before the present constitution took effect remain in force in each case until a majority of the electors shall determine to become organized under general laws, or, in the case of San Francisco, to frame a charter for their own government.

But it is asked, Is the legislature deprived of all power to amend the corporate organization of a city? Must the people of a city created before the constitution of 1879 suffer under a bad or unfortunate provision in their charter until they organize under the general law, which itself may be inapplicable to their peculiar wants? The constitution provides for a classification of cities and towns, in proportion to population, and it is not to be supposed that the people of any one city or town, containing the same population as others of its class, are surrounded by such peculiar conditions as to require a different local government. The same question might be asked and the same difficulty urged as a reason for annulling the constitutional prohibition of special statutes creating municipal corporations. It was because it had appeared in the past that special acts amending a particular law creating a municipal corporation were very often *not* sought or desired by the tax-payers and others comprising a majority of the voters, that the

framers of the constitution prohibited amendments of charters formed before the adoption of that instrument. The constitution declares the public policy, "corporations for municipal purposes ought not to be created by special laws, but ought to be organized under general laws." To prevent confusion, however, and to consult so far the wishes of the people within the limits of corporations already formed, it continues such corporations until the citizens thereof shall choose to come in under the general laws, or, in the case of San Francisco, until a new charter shall be framed in the manner provided in section 8 of article 11. Ever since, if not before, the decision in *People* v. *Lynch*, 51 Cal. 15, attention has been drawn to the evils of special legislation affecting the government or people of a particular municipality, and it would certainly seem that the framers of the constitution of 1879, and the people who ratified it, intended to prevent all special legislative interference with existing charters, except with the consent of the citizens. This was sought to be accomplished by commanding general laws for the incorporation of cities and towns, just as the former constitution provided for general laws under which private corporations could be formed, and had prohibited special acts creating such. It was not intended that a special charter could be created for a particular municipality under the specious pretense of amending the charter previously created. It was undoubtedly supposed that wise and just legislators could perfect a general and uniform system which would secure an efficient local government to every municipality. If it be true that an amendment of a particular charter may render it satisfactory to the people of an existing city, this is no reason why the people of all other existing cities should be subject to a "general law" changing their charters in a manner which may *not* be satisfactory to them. The argument goes the whole length of demanding that special laws should be passed amending

particular charters. It needs but a glance at the special acts for city and town charters passed before the adoption of the present constitution, and the widely differing methods for street work,—adapted in each case to population and supposed peculiar conditions,—to see how violent is the presumption that the citizens of all demand a still different system of street work which disregards any " classification in proportion to population."

8. Whatever may be the meaning of the words " general laws," as used in the latter portion of section 6, article 11, of the constitution, I think it perfectly clear they do not mean laws which affect, alter, or amend the corporate organization of any city or town created before or after the constitution took effect. As to corporations organized under the general laws for municipal purposes, commanded in the first clause of the section, the expression as applied to such, if meaning the same thing, would be a mere repetition, for the section has already provided that *such* general laws "may be altered, amended, or repealed." As to a corporate organization for San Francisco brought into existence in the manner laid down in section 8 of article 11, we have seen how prudently that section guards against alterations without the consent of the people. As to the corporations in existence when the constitution was adopted, the " general laws " applicable to them are the same kind of general laws to which corporations formed under general laws for municipal purposes, and any corporation organized in pursuance of section 8, are subject, etc., and by which they are controlled. And section 6 itself provides that corporations existing prior to the constitution shall be subject to the general laws mentioned in the first part of that section (and of course to general laws amending such general laws) only with the consent of the people residing within the territorial limits of such corporations

What are the general laws mentioned in the last clause of section 6?

Cities are composed of citizens, and it seems to me hypercriticism to say that "general laws" which control cities, or to which they are subject, cannot include general laws of the state directly controlling, or to which are directly subject, the people living in a city; the more especially as it appears from the context, and other portions of the constitution, that the term was not intended to apply to laws which changed the powers or obligations of incorporated municipalities.

State laws have sometimes been said to be general when they apply to all of a class of individuals, as distinguished from special laws applicable to an individual. I find it difficult to apprehend that a statute is general, in the sense mentioned, which is not a general statute under which cities may be organized, — the alteration of which is reserved to the legislature by the constitution, — but which changes the government of two or more cities organized under separate charters. However this may be, the word "general" is not alone employed to distinguish statutes binding on a class of persons from those binding on a single person. Statutes are not merely public or private, and a statute affecting the government of a single city is public. Statutes are general or *local*, — having operation throughout the state, or in a particular place or places. The very autonomy of the cities would seem to emphasize the statement that laws operative in the cities alone are *local laws*, as distinguished from laws operative everywhere within the territorial limits of the state, whether such local laws are enacted by the state legislature, or by the legislative body of the city within the powers conferred by its charter.

In view of the very extended powers conferred on the municipalities, and in harmony with the policy apparent throughout the instrument, the constitution leaves

as far as possible the management of matters of local concern with local governments, but declares that the residents of cities must not be deemed to be beyond the control of general laws affecting them in common with all the people of the state. The people of San Francisco owe allegiance to the state as well as obedience to ordinances within the legislative power granted the city, and they are subject to all general laws of the state. Such are laws relating to the organization of the Superior Courts, laws defining crimes and civil rights, regulating the mode of contracting; perhaps all laws which confer rights or impose duties upon all the people, or it may be a portion of the people, of the state, but which are not local in that they apply only to the people within particular places less than the whole state.

It may be added that, in a certain sense, a municipal corporation—not the abstract entity, but the officers thereof—is subject to and controlled by general laws of the character referred to. The local legislature has no power to pass ordinances which conflict with the general statutes of the state, nor any power to pass an ordinance in conflict with the general unwritten law of the state,—as an *unreasonable* ordinance, — unless, at least, expressly authorized by its charter.

It may be that the foregoing enumeration of "general laws," operative everywhere within the boundaries of the state, as distinguished from laws local in their character, because of force only within the cities, is imperfect or even inaccurate. I am only required, however, to say that the act of 1885 is not such a general law.

The question, What are not general laws? (within the meaning of the last clause of section 6, article 11, of the constitution) was fully answered by Mr. Justice Sharpstein in *Staude* v. *Election Commissioners*, 61 Cal. 325, where that learned judge said: "It is clear to my mind that when the constitution declares that cities organized before its adoption shall be subject to and con-

trolled by general laws, it means laws as to matters not specifically provided for in charters which existed at the date of the adoption of the constitution.   Otherwise they would be subject to and controlled by general laws passed for the incorporation of cities and towns, without having first voted to organize under such laws; and that was the contention of plaintiff's attorney in *Desmond* v. *Dunn,* 55 Cal. 242."

SHARPSTEIN, J., concurred in the views expressed by Mr. Justice McKINSTRY.