Argued 31 October; decided 25 November, 1901.

40  167
41  493

## LADD *v.* HOLMES.

[66 Pac. 714.]

CONSTITUTIONALITY OF ELECTION LAW—SPECIAL AND LOCAL ACT.

The primary election law of 1901, commonly known as the Lockwood Act (Laws, 1901, p. 317), providing a method of holding primary elections in cities having a population of ten thousand or more, "as shown by the last state or federal census," though applicable to but one city at the time of its enactment, extends to all cities as they subsequently acquire the prescribed population, as the context shows that the act was not intended to apply to only cities that had ten thousand people at the time of the last preceding census, and it is therefore neither special nor local.

ELECTION LAW—REASONABLE CLASSIFICATION.

A classified election law that operates equally upon all within a certain class, as for example, upon all the people within cities over a given size, is based upon a reasonable distinction and is enforceable.

SPECIAL AND LOCAL ELECTION LAW.

The act of 1901, p. 317, providing a method of holding primary elections in cities of a certain class is not a special or local law because it provides for the punishment of offenses arising out of the violation of its provisions, since that is merely an incident to the act.

FREE AND EQUAL ELECTIONS—CONSTITUTIONAL CONSTRUCTION.

The meaning of the word "free" in the Constitution of Oregon, Art. II, § 1, providing that "all elections shall be free and equal," is that the voter shall not be hindered or prevented from free participation in the election; and the word "equal" in the same section means the right of every qualified elector to have his vote counted as cast, and to have the votes of only qualified persons counted, to the end that his vote may exercise its just effect in proportion to the number of votes cast by qualified persons.

IDEM.

The Lockwood Primary Act (Laws, 1901, p. 317), providing a method of holding primary elections for the selection of delegates to nominating conventions, imposes no restraint upon electors, and does not deny to them their proper influence; and hence it is not in conflict with Const. Or. Art. II, § 1, guarantying that elections shall be "free and equal"

ELECTION AUTHORIZED BY LAW—PRIMARY ELECTION.

A law such as Laws, 1901, p. 317, requiring the holding of primary elections for the selection of delegates to nominating conventions under the supervision of public officers at public expense, provides for an election "authorized by law and not provided for by the constitution," within the meaning of Const. Or. Art. II, § 2, prescribing the qualfications of electors in all such elections: *Harris* v. *Burr,* 32 Or. 348, applied.

RIGHTS OF ELECTORS TO VOTE.

Laws, 1901, p. 317, providing a method of holding primary elections for the selection of delegates to nominating conventions, and limiting the right of the party electors to vote at their respective party primaries, is not in conflict with Const. Or. Art. II, § 2, providing that qualified electors "shall be entitled to vote at all elections authorized by law;" for the right to vote is dependent upon the residence of the elector and the nature of the election.

ELECTION LAW—EQUAL PRIVILEGES AND IMMUNITIES.

An election law such as Laws, 1901, p. 317, providing a method of holding primary elections for the selection of delegates to nominating conventions, denying the benefits of the act to political parties which did not cast at the next preceding election at least a specified per cent. of the total vote, but permitting such minor parties to make nominations in other modes, is not in conflict with Const. Or.. Art I, § 20, prohibiting the granting to any citizen or class of citizens of privileges or immunities which upon the same terms shall not equally belong to all citizens, since the act is but a reasonable regulation of the larger parties, designed to safeguard the privileges of the electors thereof, and is not an infringement of the rights of the minor parties.

PRIMARY LAW—RIGHTS OF POLITICAL PARTIES.

An election law such as Laws, 1901, p. 317, requiring the holding of primary elections under the supervision of the general election officers, prescribing a test for the indication of party affiliations, and directing the manner of electing committeemen, fixing their terms of office, and specifying their duties, is not an unwarrantable invasion of the rights of political parties, nor an infringement of the rights guarantied by Const. Or. Art. I, §§ 26, 33, securing the right of the people to peaceably assemble to consult for their common good, and prohibiting the impairing of the rights and privileges retained by the people, but is merely a regulation of party management, designed to secure to the voters free expression of their will.

PRIMARY LAW—DEPRIVATION OF POLITICAL RIGHT.

An election law directing that no person shall be entitled to vote at a primary election unless he shall have complied with the law relating to registration of electors and shall be entitled to vote at the next ensuing general election (Laws, 1901, pp. 317, 323) does not exclude nonregistered electors ; for the registration act (Laws, 1899, p. 128), made operative at a primary election, permits such electors to vote upon prescribed conditions.

PRIMARY ELECTIONS—REGULATING POLITICAL PARTIES.

Laws, 1901, p. 317, providing a method of holding primary elections for the selection of delegates to nominating conventions, is not void for failing to provide for special elections, since such failure relegates the parties in such cases to prior existing methods.

PRIMARY ELECTION LAW—DISCRIMINATION AGAINST DISTRICTS.

Laws, 1901, p. 327, § 24, declares that political parties may provide, as they deem best, for the election of delegates to county conventions from precincts beyond the limits of cities operating under the law.  Section 25 directs that the county committee shall be composed of a representative from each precinct in the county, and requires that the committee shall apportion the delegates among the precincts in accordance with the party vote polled at the last preceding election, upon a ratio determined by it.  *Held,* that the act does not discriminate against country districts and deprive them of representation in the county conventions, since the delegates thereto must be apportioned in accordance with the party vote polled at the last preceding election by a committee composed of a representative from each precinct of the county.

CONSTITUTIONAL LAW—TITLE OF ACT.

Section 25 of Laws, 1901, p. 327, requiring the appointment of a county managing committee and defining its duties, is germane to and connected with the subject of the act—"to provide for primary elections in cities  *   *   * and providing the manner of conducting the same . *   *   * ,"—and hence the law is within the purview of Const. Or. Art. IV, § 20, requiring that every

act shall embrace but one subject and matters properly connected therewith which subject shall be expressed in the title.

PRIMARY ELECTION LAW—APPORTIONMENT OF EXPENSE.

The expenses of primary elections in certain cities, held under Laws, 1901, p. 317, being an incident to a general law, may be imposed upon the counties in which such cities are located.

From Multnomah: MELVIN C. GEORGE, ALFRED F. SEARS, JR., and JOHN B. CLELAND, Judges, sitting in joint session.

This is a suit by Wm. M. Ladd, Fred H. Page, John Bain, and Finlay McKercher, citizens, electors, and taxpayers of Multnomah County, to restrain H. H. Holmes, the county clerk, from attempting to enforce the provisions of two statutes passed by the last legislature (Laws, 1901, pp. 317 and 401), called the Morgan Primary Law and the Lockwood Primary Law, respectively. After a hearing the court sustained the objections to the Morgan act, but upheld the Lockwood act, whereupon the plaintiffs appeal.          AFFIRMED.

For appellants there was a brief over the names of *Edw. W. Bingham,* and *Wallace McCamant,* with an oral argument by *Mr. McCamant.*

For respondent there was a brief over the names of *Geo. E. Chamberlain, Chas. H. Carey,* and *Chas. E. Lockwood,* with an oral argument by *Messrs. Lockwood* and *Carey.*

MR. JUSTICE WOLVERTON delivered the opinion of the court.

This is a suit to enjoin the Clerk of the County Court of Multnomah County from incurring any pecuniary liability in behalf of the county under the acts passed by the legislative assembly at its last session for the regulation of primary elections within the City of Portland, known as the Morgan and Lockwood acts; the evident purpose being to test the constitutionality of both acts. The circuit court declared the Morgan act invalid, but sustained the other, and the plaintiffs appeal.

The defendant not having appealed, there are left for our consideration the questions presented as they have relation to

the Lockwood act only. The plaintiffs are all taxpayers of Multnomah County, and reside within the City of Portland, except Bain, who lives outside of the city limits. McKercher belongs to the Prohibition party, which polled less than three per cent. of the entire vote cast in the county at the last general election, while Bain has no party affiliations. Thus are brought into the record all classes of individuals affected by the act in question, as it respects their personal rights and privileges under the constitution. The act provides, *inter alia,* that "elections hereafter held in any incorporated city of the state containing a population of ten thousand or more, as shown by the last state or federal census, by any voluntary political association or party, for the purpose of selecting delegates to any convention to nominate candidates for public office, shall be held under the provisions of this act, and such elections shall be styled primary elections": Laws, 1901, p. 317. But it is not to be construed to affect direct nominations without conventions, or nominations by assemblages of electors, as may otherwise be provided for by law. It is made the duty of the county clerk to designate a day, not less than sixty days before any general election, to be known as "Primary Day." Any and all political parties or associations which at the election next preceding polled a sufficient percentage of the entire vote in the state, county, city, precinct, or other electoral district for which nominations are to be made by the convention, to be entitled to make nominations as a political party or association under the laws of the state governing general elections, shall be entitled to vote at such primary election for delegates to their respective party conventions. No nomination made by any convention of delegates shall be deemed lawfully made, or be printed upon the sample or official ballot for use in any general or municipal election, unless such delegates were selected by a primary election held in accordance with this act. Not less than seven days before the time designated for holding the elections the managing committee of the political party desiring to hold a convention of delegates shall cause notice to be given, designating the number of delegates

to be selected, and the apportionment thereof to each election precinct. Provision is made for the nomination of delegates, and for having them certified by the county clerk and placed upon the official ballot, which is the only one that may be used at the polls. The judges and clerks of the general election, as selected by law, are required to serve at the primary election. If an elector is challenged, an oath may be administered, and he may be examined touching his qualifications as an elector at that election, and as a member of the political party or association whose ticket he may desire to vote, and, in determining his residence and qualification, the judges shall be governed by the rules for the conduct of general elections, so far as applicable; but no person is entitled to vote a ticket of any political party unless he resides in the precinct and shall have complied with the requirements of the law relating to the registration of electors, "nor unless, if challenged, he shall swear or affirm that he voted for a majority of the candidates of such party or association at the last election, or intends to do so at the next election": Laws, 1901, p. 323. The names of the electors voting are to be counted, and the number written in each of the poll books and certified by the judges and clerks; and the returns are to be canvassed by the county clerk with the assistance of two justices of the peace, who shall certify and publish the names of the persons having the highest number of votes, and those only shall be entitled to sit in the convention. Parties are entitled to make provision as they deem proper for the election of delegates for outside precincts. One committeeman may be selected by each city or county convention from each election precinct, who shall be the representative of his party in and for such precinct, and the committeemen from all parts of the county shall constitute the county central committee. The term of office is two years from the date of the first meeting, immediately following the election, and, in case of a vacancy occurring, the remaining members may fill it.

To pursue logically the inquiry presented by the record, we have first to consider whether the act is special or local, and

within the inhibition of the state constitution, Art. IV, § 23, subd. 13, as to the passage of any law "providing for opening and conducting the elections of state, county, or township officers, and designating the places of voting," because, if it is, there is no necessity for looking further, as it disposes of the case at once. It is insisted that by the express provisions of the act it was intended to have operation in the City of Portland alone,—that being the only city with a population of ten thousand,— and that it can never extend to or include other cities, should they come to have or possess as great or larger population. If such is the true intendment of the act, the point would be well taken, as it would then be local, or, as the term is defined by Mr. Sutherland, "special as to place": Sutherland, Stat. Const. § 127. "A local act," says Mr. Justice LORD, in *Maxwell* v. *Tillamook County,* 20 Or. 495, 500 (26 Pac. 803, 804), "applies only to a limited part of the state. It touches but a portion of its territory, a part of its people, or a fraction of the property of its citizens." A law may be general, however, and have but a local application; and it is none the less general and uniform, because it may apply to a designated class, if it operates equally upon all the subjects within the class for which the rule is adopted; and, in determining whether a law is general or special, the court will look to its substance and necessary operation, as well as to its form and phraseology: *People* v. *Hoffman,* 116 Ill. 587 (5 N. E. 596, 8 N. E. 788, 56 Am. Rep. 793); *Nichols* v. *Walter,* 37 Minn. 264 (33 N. W. 800). This is the accepted rule everywhere.

Referring to a provision in the Constitution of North Dakota of similar import to the one here invoked, Mr. Chief Justice CORLISS says: "To say that no classification can be made under such an article would make it one of the most pernicious provisions ever made in the fundamental law of the state. It would paralyze the legislative will. It would beget a worse evil than unlimited legislation,—grouping together without homogeneity of the most incongruous objects under the scope of an all-embracing law": *Edmonds* v. *Herbrandson,* 2 N. D. 270, 273 (50 N. W. 970, 971, 14 L. R. A. 725, 727). The

greater difficulty centers about the classification. It may not be arbitrary, and requires something more than a mere designation by such characteristics as will serve to classify. The mark of distinction must be something of substance, some attendant or inherent peculiarity calling for legislation suggested by natural reason of different character to subserve the rightful demands of governmental needs. So that, when objects and places become the subject of legislative action, and it is sought to include some and exclude others, the inquiry should be whether the distinctive characteristics upon which it is proposed to found different treatment are such as in the nature of things will denote in some reasonable degree a practical and real basis for discrimination: Sutherland, Stat. Const. §§ 127, 128; *Nichols* v. *Walter,* 37 Minn. 264 (33 N. W. 800); *Edmonds* v. *Herbrandson,* 2 N. D. 270 (14 L. R. A. 725, 727, 50 N. W. 970, 971); *State ex rel.* v. *Hammer,* 42 N. J. Law, 435; *People ex rel.* v. *Board of Sup'rs,* 185 Ill. 288 (56 N. E. 1044). Accordingly, it was held that a law general in its scope, framed upon a classification governed by these distinctive principles, is not special or local because there happens to be but one individual of the class, or one place in which it has actual and practical operation: *Van Riper* v. *Parsons,* 40 N. J. Law, 1; s. c. (second appeal) 40 N. J. Law, 123 (29 Am. Rep. 210). A statute, however, which is plainly intended to affect a particular person or thing, or to become operative in a particular place or locality, and looks to no broader or enlarged application, may be aptly characterized as special and local, and falls within the inhibition. Of such is *State ex rel.* v. *Mitchell,* 31 Ohio St. 592. There the act complained of was made applicable to ''cities of the second class having a population of over thirty-one thousand at the last federal census;'' the language quoted being construed as signifying the federal census last taken prior to the passage of the act, which made it operative in the single city of Columbus, and it could never extend to or include other cities, notwithstanding they might advance to a like population. The act was, therefore, although general in terms, purely local in its operation. So, in *State*

*ex rel.* v. *Anderson,* 44 Ohio St. 247 (6 N. E. 571),—a case involving an act creating the office of police judge in all cities of the second and third classes, having a population at the last federal census of sixteen thousand five hundred and twelve, and no more,—it was held that the act was special, as it could under no condition apply to any other city than Akron. To the same purpose are *Mott* v. *Hubbard,* 59 Ohio St. 199 (53 N. E. 47); *Nichols* v. *Walter,* 37 Minn. 264 (33 N. W. 800); *Edmonds* v. *Herbrandson,* 2 N. D..270 (14 L. R. A. 725, 727, 50 N. W. 970, 971); *Devine* v. *Commissioners,* 84 Ill. 590; *Commonwealth ex rel.* v. *Patton,* 88 Pa. St. 258. In all these the language of the acts concerned was so restrictive as to confine their operation strictly to definite localities,—so much so, as was said in the last case cited, that the legislature may as well have pointed out the places by naming them, and thus have excluded all others. It may be stated as a positive rule of general application that all acts or parts of acts attempting to create a classification of cities by population which are confined in their operation to a state of facts existing at the date of their adoption or any particular time, or which by any device or subterfuge exclude other cities from ever coming within their purview, or based upon any classification which in relation to the subject concerned is purely illusory, or founded upon unreasonable, obnoxious, or ill-advised distinctions, are ineffectual, as not being founded in substance, are inimical to the constitutional interdiction against special and local legislation, and are therefore null and void: *State ex rel.* v. *Donovan,* 20 Nev. 75 (15 Pac. 783).

Upon the other hand, many acts have been sustained, and are constantly being upheld, that have local application merely, where they are based upon a reasonable and proper classification: *People* v. *Hoffman,* 116 Ill. 587 (56 Am. Rep. 793, 5 N. E. 596, 8 N. E. 788), is a case which involved a law containing an exception requiring supervisors in a county containing a soldiers' home to provide a polling place within the inclosure of such home. So in *Hanlon* v. *Board of Com'rs,* 53 Ind. 123. There the act declared that the county auditor in each county

should receive increased compensation "when the population of the county exceeds fifteen thousand, as shown by the last preceding census, taken by the United States." See, also, *State ex rel.* v. *Reitz,* 62 Ind. 159, where the act gave the judges of the criminal courts $2,000 per annum, with a provision "that in all counties having a population of forty thousand, the salary * * * shall be twenty-five hundred dollars;" and, in *City of Indianapolis* v. *Navin,* 151 Ind. 139 (47 N. E. 525, 51 N. E. 80, 41 L. R. A. 337, 344), where the act was made to apply only to street railroad companies operating in cities of one hundred thousand or more population. A similar case is *Tuttle* v. *Polk,* 92 Iowa, 433 (60 N. W. 733), and many others may be cited: See *People ex rel.* v. *Wallace,* 70 Ill. 680; *People ex rel.* v. *Onahan,* 170 Ill. 449 (48 N. E. 1003); *Wheeler* v. *City of Philadelphia,* 77 Pa. 338; *Kilgore* v. *Mcgee,* 85 Pac. 401; *Seabolt* v. *Commissioners,* 187 Pa. 318 (41 Atl. 22); *Varney* v. *Kramer,* 62 N. J. Law, 483 (41 Atl. 711); *Thomason* v. *Ashworth,* 73 Cal. 73 (14 Pac. 615); *In re Church,* 92 N. Y. 1; *People ex rel.* v. *Squire,* 107 N. Y. 593 (14 N. E. 820, 1 Am. St. Rep. 893, and note); *Darrow* v. *People,* 8 Colo. 417 (8 Pac. 661); *State ex rel.* v. *Higgins,* 125 Mo. 364 (28 S. W. 638); *Dunne* v. *Kansas City Ry. Co.* 131 Mo. 1 (32 S. W. 641); *Johnson* v. *City of Milwaukee,* 88 Wis. 383 (60 N. W. 270); *Boyd* v. *City of Milwaukee,* 92 Wis. 456 (66 N. W. 603); *Harwood* v. *Wentworth* (Ariz.), 42 Pac. 1025, s. c. 162 U. S. 547 (16 Sup. Ct. 890); *Holmes Furniture Co.* v. *Hedges,* 13 Wash. 696 (43 Pac. 944); *State ex rel.* v. *Stuht,* 52 Neb. 209 (71 N. W. 941).

We come now to an interpretation of the statute, since we have ascertained the rule by which we may distinguish between a general and special or local law. Much has been said relative to the duty of the court to uphold the law, as constitutional, if it is possible to do so without doing violence to common reason and understanding. But we do not conceive the rules of construction in ascertaining the intendment of an act, and thereby determining whether it is within or without the constitution, to be different from those applicable ordinarily,

where its true intendment and purpose are brought to the test for the ascertainment of its operative effect, for where the one is determined the other is resolved also. There is this, however, to be borne in mind: That, by reason of the legislature having adopted the act, there goes with it a presumption that it is within the pale of the fundamental law, otherwise it would not have met with the approval of that body; and in every case where there exists, when proper tests have been brought to bear, a rational doubt upon the subject, it should be resolved in favor of its validity. Courts are never called upon to adopt a strained or unnatural construction for the specific purpose of upholding a law, and, when they have ascertained by fair and reasonable intendment that it is inimical to some fundamental provision, they will not hesitate to so declare. This is a solemn duty enjoined upon them by the settled law of the land, as well as by the oath which individual judges take to support the constitution, under which they derive their powers primarily. The act is to have operation in any incorporated city containing a population of ten thousand or more, "as shown by the last state or federal census." Portland, at the time of its passage, was the only city falling within the classification. This fact, as we have seen, does not derogate from the validity thereof. But does the language employed limit the operation of the act to that city alone, to the exclusion of other cities within the state that may subsequently acquire the prescribed population? If it does not, the next inquiry will be whether the classification is one founded upon some real and substantial, not fanciful, distinction, suggested and prompted by reason and experience. Some cases have been alluded to wherein the population forming the basis of classification was referable to the last census, state or federal, naming but one, and the acts embodying the idea were all held to be invalid. By the present act both the state and federal census are named in the alternative. It is a matter of judicial cognizance that the federal census is taken at the close of a decade, while the state census is taken five years thereafter: (Const. Art. IV. § 5; Hill's Ann. Laws, § 2233); thus affording a census enu-

meration every five years,—the last federal census having been taken in 1900, and that of the state in 1895. Now, it is reasonable to suppose that the legislature had this state of the law in mind when it adopted the act, and that it used the words "last state or federal census," not for the purpose of adopting the census of 1900 as an inflexible standard, but rather that the census, as taken from time to time, whether state or federal, should constitute the basis by which the classification should be governed. If the intention had been otherwise, the most natural expression would have been the "last federal census," which would have meant unmistakably the federal census of 1900, and the validity of the act would have been tested thereby to its destruction. The expression employed does not convey that idea at all, but was intended to signify, no doubt, the last preceding census, whether state or federal, so that in any period of five years other cities advancing to the designated standard will fall within the class, and be subject to the operation of the act. The identical language is used in the primary act of 1891, and its validity has never been questioned upon the ground that it was special or local, and the construction that we have given to the act in controversy has been adopted in actual practice and usage. Now, as to the other point, experience has shown that rules and regulations of more specific and stricter character are needful for properly controlling and governing elections in larger and more densely populated cities and towns than in the smaller ones, and in rural districts; so that a classification with respect to elections founded upon population is but a reasonable method of regulation, and the basis adopted affords an appropriate and legitimate distinctive characteristic for the purpose. We conclude, therefore, that the act in question is general, and not in contravention of the state constitution, Art. IV, § 23, subd. 13. This disposes of the other contention, also,—that the act is special and local, as providing for the punishment of crimes and misdemeanors. The offenses alluded to are creatures of and inci-

40 OR.—12.

dent to the act, and, it being general, the punishment was properly provided for.

This contention being resolved favorably to the validity of the act, we are next brought to the consideration of its appropriate relation to a group of constitutional provisions, as to each of which it is strenuously urged that it stands in positive contravention. These are Article I, § 20, and Article II, §§ 1, 2. Article II, § 1, provides that all elections shall be free and equal. To be free means that the voter shall be left in the untrammeled exercise, whether by civil or military authority, of his right or privilege; that is to say, no impediment or restraint of any character shall be imposed upon him, either directly or indirectly, whereby he shall be hindered or prevented from participation at the polls: *De Walt v. Bartley*, 146 Pa. St. 529 (24 Atl. 185, 15 L. R. A. 771, 28 Am. St. Rep. 814; *People* v. *Hoffman*, 116 Ill. 587 (56 Am. Rep. 793, 5 N. E. 596, 8 N. E. 788). The word "equal" has a different signification. Every elector has the right to have his vote count for all it is worth, in proportion to the whole number of qualified electors desiring to exercise their privilege. Now, if persons not legitimately entitled to vote are permitted to do so, the legal voter is denied his adequate, proportionate share of influence, and the result is that the election, as to him, is unequal; that is, he is denied the equal influence to which he is entitled with all other qualified electors: "Ballot Reform, Its Constitutionality" (John H. Wigmore), 23 Am. Law. Rev. 719) ; *Edmonds* v. *Banbury*, 28 Iowa, 267, 271 (4 Am. Rep. 177) ; *Davis* v. *School Dist.* 44 N. H. 398, 404; *Commonwealth* v. *McClelland*, 83 Ky. 686. So that the terms "free" and "equal," used as they are, correlatively, signify that the elections shall not only be open and untrammeled to all persons endowed with the elective franchise, but shall be closed to all not in the enjoyment of such privilege under the constitution.

Does the election provided for by the act in controversy come within the purview of section 2, Art. II of the constitution, which provides that, "in all elections not otherwise provided for by this constitution, every white male citizen of the

United States, of the age of twenty-one years and upwards, who shall have resided in the state during the six months immediately preceding such election, and every white male of foreign birth of the age of twenty-one years and upwards, who shall have resided in this state during the six months immediately preceding such election, shall have declared his intention to become a citizen of the United States one year preceding such election, conformably to the laws of the United States on the subject of naturalization, shall be entitled to vote at all elections authorized by law''? We believe that it does. We had occasion to construe this clause in *Harris* v. *Burr*, 32 Or. 348 (52 Pac. 17, 39 L. R. A. 768). Its significance, as then ascertained, is that the individuals therein designated are entitled to vote at all elections authorized by law, not otherwise provided for by the constitution. School elections are controlled by the constitutional provision whereby the legislative assembly is required to provide by law for the establishment of a uniform and general system of common schools. Therefore it was held that such elections were otherwise provided for by the constitution, and that a law extending to women the privilege of voting at school elections was not inimical to section 2, Art. II. It seems to us hardly a matter of serious controversy that the elections presently provided for are such as are authorized by law. They are, in practical effect, required to be held by all parties polling a three per cent. vote, as no convention nomination can be legally made unless the delegates attending such convention from the precincts included within a city falling within the class prescribed are selected at such primary election. The judges of election appointed under the general law are authorized and required to preside at the primary election, and to count and certify the vote; and the county clerk, a public functionary, is, with the assistance of two justices of the peace, required to make abstracts from the returns, and thereupon to publish the result, the delegates receiving the highest number of votes being entitled to sit in the convention, and the election is held at public expense. With all this, there is certainly an election authorized by law,

and such a one as is not elsewhere provided for by the constitution: *Spier* v. *Baker,* 120 Cal. 370 (52 Pac. 659, 41 L. R. A. 196); *Britton* v. *Board,* 129 Cal. 337 (61 Pac. 1115, 51 L. R. A. 115). The act is none the less valid because it provides for a party election, or, to speak more precisely, elections had at party primaries. All electors of parties authorized or required to hold such elections are entitled to vote at their respective party primaries, and not elsewhere. It is not true that every citizen accorded the elective franchise under the constitution is entitled to vote at all elections. A citizen of one county is not entitled to vote at an election held in another county for local officers, and a citizen of one precinct is not entitled to vote in another, nor of one city or town in another; so that the right of all electors to vote does not extend to all elections authorized by law, but is dependent largely upon the place of residence, and the nature of the election to be held. So it is where party primary elections are held, such as are authorized and required by law, and under the supervision and inspection of public functionaries; it is not a violation of the constitution that all electors are not permitted to vote at a particular party election. Electors of one party have no desire, unless prompted by sinister or evil motives, nor have they any inherent right, within or without the constitution, to vote at some other party primary or election; hence no right or privilege of which they can complain has been intrenched upon or violated. We see no objection to the legislature providing for party elections, and limiting the electoral privilege to party members. The exclusion of other party members from participating in such elections is not an infringement or denial of a constitutional right or privilege.

The state constitution, Art. I, § 20, provides that ''no law shall be passed granting to any citizen or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens.'' Mr. McKercher complains (he being a Prohibitionist, and a member of a party casting less than three per cent. of the vote at the preceding general election) that there is an unjust and unwarranted discrimination

against his party as a class, as no provision is made in the act whereby his party may hold primary elections for the purpose of selecting representatives to a convention of delegates, and hence that he and his party are denied a privilege granted to parties casting more than three per cent. of the vote. The requirements of the act, however, do not amount to more than a regulation suited to the larger number of adherents entitled to participate, for the better safeguarding and preservation of the privileges of electors. Under the Australian Ballot Law, only such parties as have cast a three per cent. vote are entitled to have the names of their candidates printed upon the official ballot through the instrumentality of a convention of delegates. Parties of a smaller membership can only secure a place upon such ballot by means of an assembly of electors or a certificate of nomination by individual electors; and this is held to be a regulation merely, and not an infringement of any constitutional right of the minor or smaller parties, or the members thereof. Such a provision was brought to the test in Pennsylvania in *De Walt* v. *Bartley,* 146 Pa. 529 (24 Atl. 185, 15 L. R. A. 771, 28 Am. St. Rep. 814), where the insistence was the same as here, respecting which Mr. Chief Justice PAXSON says: "The contention is plausible, but unsound. The act does not deny any voter the exercise of the elective franchise because he happens to be a member of a party which at the last general election polled less than three per cent. of the entire vote cast. The provision referred to is but a regulation, and we think a reasonable one, in regard to the printing of tickets." So, in Wisconsin, where, as in Pennsylvania, the Australian Ballot Law was challenged upon the distinctive ground that it was an unwarrantable discrimination between different classes of voters, it was held, in effect, that a reasonable qualification for party representation upon the official ballot was not a constitutional discrimination between such clases: *State* v. *Anderson,* 100 Wis. 523 (76 N. W. 482, 42 L. R. A. 239). To the same purpose is *State* v. *Poston,* 58 Ohio St. 620 (51 N. E. 150, 42 L. R. A. 237), and *Ransom* v. *Black,* 54 N. J. Law, 446 (24 Atl. 489, 1021, 16 L. R. A. 769). The

privilege of holding primaries under regulations prescribed by law, if it can be denominated a privilege, is but a means employed for the designation or certification of delegates whose business it becomes to name candidates for public office; the ultimate purpose being to afford party representation upon the official ballot. The minor parties are afforded ample opportunity for obtaining a like representation thereon, and, while a different mode of procedure is pointed out for the accomplishment of the purpose, there is no denial or infringement upon the ultimate right or privilege of voting for the candidate of their choice with equal ease and facility. The difference in the mode of obtaining representation upon the official ballot is reasonably suited to the proper direction, supervision, and control of the greater parties at their primaries, with a view of securing a free and equal ballot; and the system was so designed, and cannot be considered else than a regulation looking to that end. There is no discrimination against the minor parties, except in the mode of certifying their nominations, as they may yet hold primaries and conventions, and this is justified by the substantial difference in party conditions. The analogy between this and the Australian Ballot Law in respect to obtaining a place upon the official ballot is apparent and complete.

Another contention strongly pressed is that the system of primary elections provided for by the act unwarrantably interferes with the party management of political concerns. It is not claimed that any positive constitutional provision is intrenched upon, except as sections 26 and 33 of Article I of the Bill of Rights may affect the matter incidentally. It is said in the brief that, ''independent of any expression in the fundamental law of the state, there are certain political rights, incidental to those guarantied by the constitution, which cannot be abridged by the legislature.'' In elaboration of that idea, as applicable generally, we quote from the language of Mr. Justice CHASE in *Calder* v. *Bull,* 3 Dall. 386,—a case cited by counsel. He says: ''There are certain vital principles in our free republican governments which will determine and over-

rule an apparent and flagrant abuse of legislative power; as
to authorize manifest injustice by positive law, or to take away
that security for personal liberty or private property for the
protection whereof the government was established. An act
of the legislature (for I cannot call it a law) contrary to the
great first principles of the social compact cannot be consid-
ered a rightful exercise of legislative authority.  *  *  *  It
is against all reason and justice for a people to intrust a legis-
lature with such powers, and therefore it cannot be presumed
that they have done it": *Citizens' Saving Assoc.* v. *Topeka,*
87 U. S. (20 Wall.) 655, 662, is to the same purpose. The Bill
of Rights declares (Article I, § 33) that the enumeration of
rights and privileges therein contained shall not be construed
to impair or deny others retained by the people. The rights
insisted upon here, it is thought, are among those retained or
reserved. By section 26, Art. I, there can be no restraint of
any of the inhabitants of the state from assembling together
in a peaceable manner to consult for their common good. Based
upon these principles, the plaintiffs assert that they and all
other citizens of Oregon are vested with certain political rights
that are invaded by the act, among which are the right of asso-
ciation with others for political purposes, and the right to pro-
tect their organizations from invasion and control by those
whose purposes in politics are adverse. This leads to an in-
quiry touching those political rights, and to what extent they
may be regulated and restricted by legislative action.

In the United States the history of parties begins with the
constitutional convention of 1787. It extends throughout all
the ramifications and complexities of the national and state
governments, and continues to the present time. Parties are
important factors in propagating, maintaining, and promul-
gating governmental policy; and it is largely through their
operation and influence that the destiny of the country is
moulded and established, and it may be that they are absolutely
essential to the maintenance of a representative form of gov-
ernment. Before the constitution it was the custom in Massa-
chusetts, and some other colonies, perhaps, for a coterie of lead-

ing citizens to put forward candidates for office, and these were generally accepted without question. Clubs sprang up in some localities, especially in New York, and became the organs of groups and parties, and brought out candidates, while in New England the clergy participated in leadership. ''Presently,'' it is said, ''as the democratic spirit grew, and people would no longer acquiesce in self-appointed chiefs, the legislatures began to be recognized as the bodies to make nominations for the higher federal and state offices. Each party in congress nominated the candidate to be run for the presidency, each party in a state legislature the candidate for governor, and often for other places also.''

This lasted through the early decades of the nineteenth century, but as party struggles became more intense a closer and more comprehensive organization was established, which satisfied the claims of the party leaders, concentrated the efforts of individuals, and knit them together for a common purpose, while it expressed absolute equality of all voters, and the right of each to participate in the selection of candidates and the adoption of party platforms. This new party *regime* grew and ripened, as it respects the Democratic party, about the year 1835, and, as to the Whigs, some years later; and, when the Republican party sprang up, it adopted the system in all of its essential features. The true theory of popular sovereignty requires that the ruling majority must name its own standard bearers or candidates, must define its policy, and in every way express its own mind and will; and the system thus developed and matured is in accord with that theory. It is strictly representative throughout; is not a mere contrivance of party intrigue, or for preventing dissensions, but an essential feature of matured democracy: 2 Bryce, Am. Com. c. 59 (entitled ''Party Organizations''), p. 44. It will be seen, therefore, that the system in vogue has developed under the constitutions, federal and state, although not a matter of special concern at the time of their adoption. The parties or organs of the system are voluntary associations, pure and simple, while the functions they perform relate in the main to public

concerns. The primary is the initial step in the system looking to the nomination of candidates whose names are to find a place upon the official ballot, and through its agencies to be submitted to the qualified electors for an expression of their choice. At the top the constitution expressly declares there shall be a free and untrammeled ballot, but its spirit pervades the whole, and reaches back to the inception of the choice of a candidate; so that every elector must be as free to express his own choice of a candidate as to denote his choice of a public officer at the polls. If it were not so, of what avail would be the ballot in the hands of the people? Once the stream is polluted at its source, access to its waters, however free, will not serve to purify it. So it is if the people or party members are deprived of their free choice of candidates, their sacred privilege of exercising an elective franchise is stripped of its virtue. Mr. Bryce, in speaking of party management and the agencies employed, including the primary, in securing nominations and promoting their selection by the people, says: ''These details have more significance and make more difference to the working of the government than many of the provisions of the constitution itself'': 2 Bryce, Am. Com. c. 60 (entitled ''Party Organizations''), p. 57. It would seem, from these observations and conditions, that party management is of such vital importance to the public and the state as that its operation, in so far as it respects the naming of candidates for public office, is an object of special legislative concern, to see that the purposes of the constitution are not perverted, and the people shorn of a free choice.

No attempt is made to specify all the particulars in which the act in question invades the right of party management, but there are three which have become prominent in the discussion. These are the appointment of judges and clerks of the election by the county court, the test prescribed for indicating party affiliation, and the manner pointed out for the election of committeemen, fixing their terms of office, and specifying their duties. It is admitted that the legislature has power to require parties to keep a registry of voters in precincts, adopt

rules and regulations for purging from the lists the names of persons as they die, move out of the precinct, or change their politics, and to provide for a secret ballot at their primaries. The primary act of 1891 requires parties to give notice of the time of holding primaries in cities of two thousand five hundred or more of population, and prescribes the manner of giving it; designates the number of judges to be appointed, fixes their qualifications, and requires them, together with the clerks to be named, to perform their functions under the sanction of an oath; and directs that their returns shall be made to the county clerk, as well as to the political organizations under whose authority such primary elections are held. These are regulations, also, which are virtually conceded to have been authoritatively made by the legislature. There is here some regulation of the acts of political parties, looking to the nomination of candidates for public office; and how much further the lawmaking power may be permitted to go, or where it shall stop, is not pointed out. But it seems to us that if the power is appropriate to requiring an oath of judges and clerks, such as is prescribed for the judges and clerks at general elections, it is also adequate to the naming of these officers through the instrumentality of the civil authorities. It is urged that partisan boards should preside over partisan primaries; and it might be better that they should, but that is a matter of policy, and not of power. So, too, with the manner in which committeemen shall be selected, the designation of their duties, and their term of office. If a managing committee may be required to give notice in a particular manner touching an anticipated primary election and appoint judges, why may not the legislature go a step further, and provide for the selection of its members, denoting the terms of office, and prescribe their duties? If the power exists in the one case, where is the line to be drawn to mark the boundary? It seems to us that when any supervision of the acts of political parties looking to the selection of candidates to be submitted to the suffrages of the people under the constitution, is conceded to be within the power of the legislature a power commensurate with a super-

vision of the entire scheme of nominations for public office is also conceded. In the case of *People* v. *Democratic Gen. Com. of Kings County,* 164 N. Y. 335 (58 N. E. 124, 51 L. R. A. 674), it was held that, under a law requiring each political party to have a general committee in each county, the members to hold their office for one year, and to be selected at primary elections in the manner pointed out by law, a member thereof could not be removed by the committee during the term for which he was elected, and, again, that legislative action contrary to and inconsistent with the rules and regulations of parties, and of conventions and committees thereof, will effectually displace and supplant all such rules and regulations, and render them nugatory. Here is positive judicial recognition of legislative authority for the supervision of party affairs, as it concerns nominations for public office, that goes beyond any provision of the Lockwood act.

The test prescribed for participating in a party primary is that the elector "voted for a majority of the candidates of such party or association at the last election, or intends to do so at the next election." The authority of the legislature to prescribe and test whatever is challenged; that being a matter, it is contended, wholly within the discretion of the parties themselves. The California primary act of 1899 was declared inoperative because it prescribed no test whatever, and permitted persons of different party affiliations to vote for party delegates: *Britton* v. *Board,* 129 Cal. 337 (61 Pac. 1115, 51 L. R. A. 115). Hence it would seem that a test is necessary. But who shall prescribe it? Neither the legislature nor the parties can prescribe any test, it is plain, that will operate to exclude legal voters of the same political faith, nor admit any that are not legally qualified, as otherwise the election would not be free and equal. The election being authorized by law, parties cannot claim any higher authority touching the qualifications of voters thereat than the legislature. If so, they might easily subvert the will of the legislature, and render the law nugatory for any substantial purpose. So the question recurs as to whether this feature is one of regulation, also. We think it is,

and within the power of the legislature to prescribe the rules relative thereto under the constitution. The fundamental principle upon which such legislative authority proceeds, and must proceed, is that its ultimate purpose is the election of public officers by a free and equal choice of the qualified electors. A free and equal choice of such officers includes a free and equal choice by party members of the delegates whose function it becomes to select partisan candidates, and the legistive authority is adequate to prescribe all reasonable rules and regulations looking to the security and safeguarding of these sacred rights and privileges. In so doing, the right of the adherents of the respective parties to assemble and consult together for their common good is in no way impinged upon, and they may still advocate and promulgate political doctrines and principles without restriction, so that it is done in a peaceable manner, and does not tend to moral obliquity, the infraction of the law (*Davis* v. *Beason,* 133 U. S. 333, 10 Sup. Ct. 299), or the destruction of the government itself. In so far as *Britton* v. *Board,* 129 Cal. 337 (61 Pac. 1115, 51 L. R. A. 115), is not in harmony with this view, if it may be so considered, we cannot approve it.

These observations are applicable to other features of the law to which objections are made. Is the test a reasonable regulation by which to ascertain party affiliation? Mr. Bryce says the usual test adopted by parties is ''Did the claimant vote the party ticket at the last important election,—generally the presidential election, or that for the state governorship''? 2 Bryce, Am. Com. c. 60, p. 55. The Wisconsin acts of 1895 and 1897 prescribe, in effect, that precise test: Sess. Laws Wis. 1895, p. 567; Id. 1897, p. 699. The California act of 1897 provides that if a person challenged make oath that it was his *bona fide* present intention to support the nominees of the convention to which delegates are to be elected for such political party or organization, he should be entitled to vote: Stat. Cal. 1897, p. 124. The act was declared unconstitutional, but not upon that ground: *Spier* v. *Baker,* 120 Cal. 370 (52 Pac. 659, 41 L. R. A. 169). And the legislature evi-

dently so understood it, as at its session of 1901 it passed another act containing precisely the same test to be applied at a party primary election: Stat. Cal. 1901, p. 615. By the New York act, the elector must declare that he is in general sympathy with the principles of the party at whose primary he desires to vote; that it is his intention to support generally at the next general election, state or national, the nominees of such party for state or national offices; and that he has not enrolled with or participated in any primary election or convention of any other party since the first day of the preceding year: Sess. Laws N. Y. 1898, vol. 1, c. 179, p. 334. This is as far as we have been able to find precedent, and we are impressed that the New York provisions are better calculated to serve the purpose for which they are intended than the others; and yet it is concededly impossible to provide any test by which all fraud and illegal voting may be detected and prevented. Much must be left to the legislature to determine, and, so long as it cannot be said that the test adopted is inapt and unreasonable, it ought to be permitted to stand; hence, we are constrained to hold that the present law is valid as it respects that specific objection.

Special attention is directed to section 14, relating to persons entitled to vote at the primary. The language is, "But no person shall be entitled to vote a ticket of any political party or association unless he resides in the precinct where he offers to vote, shall have complied with the requirements of the law relating to registration of electors, and shall be entitled to vote at the next ensuing general election under the provision" of the registration law (Laws, 1901, p. 323). Plaintiffs' counsel claim a significance for that clause which would close the door to all electors who had not secured registration prior to primary day, but, when construed with the preceding section, it is apparent that it was not so intended. That section prescribes the usual oath to be propounded to electors at a general election, which indicates that a person entitled to vote must be a qualified elector at that particular election, not that he would be entitled to vote at the general election following. The evi-

dent purpose was to give operation to the registry act, so far as applicable, so that the voter must either register, or stand challenged at the primary polls, whereupon he shall produce proofs entitling him to vote, as required by section 16 of the registry act (Laws, 1899, p. 128), before he may be allowed to do so.

Objection is made that the law makes no provision for any special election that may become necessary, but this is not vital, as the effect would be to relegate the parties to the law heretofore governing primary elections.

Another invasion of political management complained of is that there is a discrimination against country precincts; it being maintained that, by a reading of the last clause of section 24 in juxtaposition with the last clause of section 25, it becomes manifest that such precincts might be deprived of all representation in the county convention. Such an event, however, could hardly happen when it is considered that the managing committee is to be composed of a representative from each precinct in the county, who are to apportion the delegates in accordance with the party vote polled at the last preceding election.

It is next insisted that section 25 of the act which relates to the appointment of a county managing committee, and its functions and duties, is without the purview of the title of the act. The title is, "To provide for primary elections in cities having a population of more than ten thousand inhabitants, and providing the manner of conducting the same," etc. Now the matter contained in the section alluded to is germane to the subject expressed, being a regulation connected with the holding of primaries, and is therefore within its purview, within the meaning of Article IX, § 20, of the state constitution.

And, again, it is insisted that it was not competent for the legislature to impose the burden of primary elections within the City of Portland upon the whole County of Multnomah, which is made a special cause of complaint by Mr. Bain, who resides and is a taxpayer outside of the city limits. The answer to this, it seems to us, is that the expense is incident to and in

pursuance of a general law of the state, although it operates locally. The election is for the selection of precinct delegates and officers, which is properly a county charge: *Board of Com'rs of Marion County* v. *Center Tp.* 107 Ind. 584 (8 N. E. 625). This is unlike the case of *Simon* v. *Northup,* 27 Or. 487 (40 Pac. 560, 30 L. R. A. 171), where the attempt was made to impose a debt of the city upon the county which the county was neither under legal nor moral obligation to pay. Nor is the act one providing for a tax which is required to be equal and uniform, but it simply provides for the adjustment of a public burden which is appropriately incident to the county.

This disposes of all the questions involved, and, being favorable to the respondent, the decree of the court below will be affirmed.                                     AFFIRMED.