BROWN *v*. BOARD OF ELECTION COMMISSIONERS OF
KENT COUNTY.

1. Elections—Ballots—Board of Election Commissioners.
    Some showing or evidence of a candidate's right to appear on
    the official ballot should be in the hands of the board of elec-
    tion commissioners to warrant the board in causing the name
    of the candidate to be placed thereon.

2. Same—Regulation.
    Under article 3 of the Constitution the legislature has power to
    regulate but may not destroy the enjoyment of the elective
    franchise.

3. Constitutional Law — Primary Elections — Right to be
    Candidate.
    The provisions of section 37, Act No. 281, Pub. Acts 1909, as
    amended by Act No. 279, Pub. Acts 1911 (1 How. Stat. [2d
    Ed.] § 541 *et seq*.), requiring fifteen per cent. of the party
    votes at the preceding election to entitle a candidate at the
    primary to have his name printed on the ballot, do not de-
    stroy the right of franchise, since the electors may write in
    names of candidates, not appearing on the election ballot;
    and the statute is therefore constitutional. McAlvay and
    Brooke, JJ., dissenting.

Certiorari to Kent; McDonald, J. Submitted March
27, 1913. (Calendar No. 25,630.) Decided March 29,
1913. Rehearing denied April 8, 1913.

Mandamus by Alvah W. Brown and others against the
board of election commissioners of Kent county to prevent
respondents from placing the names of certain candidates
for county road commissioner on the ballot. An order
denying the writ· is reviewed by relators on writ of
certiorari. Reversed.

*Roger I. Wykes* and *A. R. Dilley*, for appellants.

*A. A. Ellis* and *C. G. Turner*, for appellee.

BIRD, J. The petitioners question the right of the election commissioners of Kent county to place the names of the Democratic and Progressive candidates for county road commissioners on the ballot for the coming spring election on the ground that such action would be in violation of section 37 of Act No. 281 of the Public Acts of 1909, as amended by Act No. 279 of the Public Acts of 1911, in that neither of such parties cast at the primary 15 per cent. of the vote cast for secretary of State at the preceding election. The material part of the section reads:

"*Provided,* that no candidate for any city, county, district or State office shall be deemed nominated and no certificate of nomination shall be given to any person whose political party with which he is enrolled casts at such primary election less than fifteen per centum of the vote cast by such political party for secretary of State at the last preceding biennial or November election; and in such case such political party shall not be entitled to have the names of any candidates printed upon the official election ballot." (1 How. Stat. [2d Ed.] § 541.)

The respondent makes reply that:

"The provisions of said section are unjust and unreasonable, and were not passed for the purpose of protecting the purity of elections, and do unjustly deprive an elector of his right of franchise, and are therefore unconstitutional and void."

At the outset attention is called to the fact that neither the Democratic nor the Progressive candidates received certificates of nomination by the board of canvassers, and that, when the board of election commissioners threatened to place the names of these candidates on the ballot, they had no *prima facie* nor other evidence before them entitling the candidates to a place thereon. We are of the opinion that, before placing the name of a candidate upon the ballot, some showing of his right to be placed thereon should be in the possession of the board. See *De Foe* v. *Board of Election Commissioners, ante,* 472 (140 N. W. 641).

If this provision of the primary law is unconstitutional

and void, the reason for its being so must be found in the Constitution itself. The only limitation upon the power of the Michigan legislature to enact laws is our own Constitution and the Federal Constitution. It follows, then, that this legislation must stand, unless it can be pointed out that it infringes some provision of the State or Federal Constitution. Article 3 of the State Constitution is devoted to the elective franchise. Sections 1, 7, and 8 are the important ones bearing upon this inquiry. Section 1 provides who shall be an elector, and that the legislature may provide the way in which his vote may be cast. Section 7 provides that all votes shall be by ballot. Section 8 provides that laws shall be passed to preserve the purity of elections and guard against abuse of the elective franchise. This court has on several occasions considered the limiting force of these provisions upon legislative enactments, and the conclusion reached was that the legislature may regulate, but cannot destroy, the enjoyment of the elective franchise. *Common Council of City of Detroit* v. *Rush*, 82 Mich. 532 (46 N. W. 951, 10 L. R. A. 171); *Attorney General* v. *City of Detroit*, 78 Mich. 545 (44 N. W. 388, 7 L. R. A. 99, 18 Am. St. Rep. 458); *Todd* v. *Election Commissioner*, 104 Mich. 474 (62 N. W. 564, 64 N. W. 496, 29 L. R. A. 330); *Attorney General* v. *May*, 99 Mich. 538 (58 N. W. 483, 25 L. R. A. 325). In commenting upon the degree of restraint of these constitutional provisions upon the power of the legislature in *Common Council of City of Detroit* v. *Rush, supra*, Mr. Justice GRANT said:

"Under these broad provisions, it has been frequently held to be the exclusive province of the legislature to enact laws providing for the registration of voters, and the time, place, and manner of conducting elections. It may regulate, but cannot destroy, the enjoyment of the elective franchise. Whether such regulation be reasonable or unreasonable is for the determination of the legislature, and not for the courts, so long as such regulation does not become destruction. *Attorney General* v. *City of Detroit*, 78 Mich. 545 [44 N. W. 388, 7 L. R. A. 99, 18 Am. St.

Rep. 458]. Courts will not declare the law invalid because its enforcement might result in the restriction of the right to vote, else the registry laws would have been held void. Yet these laws have been universally sustained, on the ground of wise and necessary regulation. In 1832 Chief Justice Shaw sustained them, on the ground that they tended to—

" 'Promote peace, order, and celerity in the conduct of elections, and as such to facilitate and secure this most precious right to those who are by the Constitution entitled to enjoy it.' *Capen* v. *Foster*, 12 Pick. [Mass.] 485 [23 Am. Dec. 632].

" The principles then enunciated have been adopted by this court in numerous cases. *People* v. *Blodgett*, 13 Mich. 127; *People* v. *Kopplekom*, 16 Mich. 342; *Attorney General* v. *Detroit Common Council*, 58 Mich. 213, 24 N. W. 887 [55 Am. Rep. 675]. When power is conferred upon the legislature to provide instrumentalities by which certain objects are to be accomplished, the sole right to choose the means accompanies the power, in the absence of any constitutional provisions prescribing the means. The finding by this court that the law impeded, hampered, or restricted the right to vote, and is therefore void, would be a clear assumption of, and encroachment upon, legislative power—a substitution of our judgment for that of the legislature. It can only be declared void when it destroys the right. Its unconstitutionality can be determined by no other rule."

The test is, then, whether section 37 destroys the elective franchise or simply regulates it. If it destroys, it is our duty to declare it void. If it merely regulates, our duty is to declare it valid and relief from its effects must be found in the legislature. An examination of section 37 will disclose that it is aimed at the voter's right to have his name placed upon the ballot, and not at his right to vote. The right to vote is protected by the Constitution. The right to have his name placed upon the ballot is one which is under the control of the legislature. But it is argued that it interferes with the exercise of the franchise in that the names of the candidates for commissioners will not be printed upon the ballot. This does not destroy the right of franchise because the voter may write the names

on the ballot.   It may render his voting less convenient, but it does not destroy or take away the right.

It is said that the 15 per cent. requirement is an unreasonable requirement, and, if, adhered to, will in many cases deprive the party ticket of a candidate for some particular office.   This may be so.   It is possible that the percentage is too high, and it may be unwise to require any percentage.   It is certain, however, that, if we are to have a primary law, somebody must be invested with the power to prescribe the rules and regulations under which a primary election shall be conducted.   That power resides in the legislature.   If the legislature has exercised that power, and while acting within the range of its authority has prescribed an unreasonable regulation, it must be remedied by it, and not by the courts.   *City of Detroit* v. *Election Inspectors*, 139 Mich. 548 (102 N. W. 1029, 69 L. R. A. 184, 111 Am. St. Rep. 430, 5 Am. & Eng. Ann. Cas. 861).   The same question has been many times before other State courts and with few exceptions it has been held that it is a legislative question.   Some of the exceptions have been based upon constitutional provisions unlike our own.   See *Miner* v. *Olin*, 159 Mass. 487 (34 N. E. 721); *Ransom* v. *Black*, 54 N. J. Law, 446 (24 Atl. 489, 1021, 16 L. R. A. 769); *De Walt* v. *Bartley*, 146 Pa. 529 (24 Atl. 185, 15 L. R. A. 771, 28 Am. St. Rep. 814); *State* v. *Poston*, 58 Ohio St. 620 (51 N. E. 150, 42 L. R. A. 237); *State* v. *Felton*, 77 Ohio St. 554 (84 N. E. 85, 12 Am. & Eng. Ann. Cas. 65); *People* v. *Williamson*, 185 Ill. 106 (56 N. E. 1127); *State* v. *Jensen*, 86 Minn. 19 (89 N. W. 1126); *State* v. *Drexel*, 74 Neb. 776 (105 N. W. 178); *Riter* v. *Douglass*, 32 Nev. 400 (109 Pac. 444); *Socialist Party* v. *Uhl*, 155 Cal. 776 (103 Pac. 181); *Ledgerwood* v. *Pitts*, 122 Tenn. 570 (125 S. W. 1036); *State* v. *Nichols*, 50 Wash. 508 (97 Pac. 728); *State* v. *Michel*, 121 La. 374 (46 South. 430); *Ladd* v. *Holmes*, 40 Or. 167 (66 Pac. 714, 91 Am. St. Rep. 457); *Healy* v. *Wipf*, 22 S. D. 343 (117 N. W. 521).

The urgent demand on the court for an immediate decision in this proceeding has limited our investigation, but we have found no constitutional restraint, nor has any been called to our attention which would render the provisions of section 37 void.

We are therefore of the opinion that the holding of the trial court should be reversed and the writ of mandamus granted. No costs will be allowed either party.

KUHN, STONE, and OSTRANDER, JJ., concurred with BIRD, J.

BROOKE, J. (*dissenting*). In this proceeding a very unusual and remarkable situation is presented. Petitioners, themselves duly nominated for office at a primary upon the Republican ticket, and, therefore, sure of their own positions upon the official ballot, seek by mandatory injunction to prevent the board of election commissioners from placing upon said ballot the names of the men nominated at the same primary upon the democratic and progressive tickets. I am of opinion that it may well be doubted whether petitioners have shown that they have such an interest in the matter as entitles them to interfere. This interest is not in themselves getting upon the official ballot, that right is already secured to them, but they, as the properly qualified nominees of one party, seek to inquire into the legality of the nomination of their opponents by other parties, and, through such inquiry, prevent the printing of the names of any candidates of opposing parties upon the official ballot. Can it be said that their right to a position upon a "legal ballot" is such as to clothe them with the power to intervene as individuals for such a purpose? My Brethren are of opinion that they have such an interest. I think it is at least open to grave question. Petitioners say that the said board has declared its intention to place the names of their opponents upon the official ballot, and that, unless restrained, it will do so. They aver that such action would be unlawful, and, as authority for their position, they point to section 37 of

the so-called primary law (Act No. 281, Pub. Acts 1909, as amended), which provides:

"That no candidate for any city, county, district or State office shall be deemed nominated and no certificate of nomination shall be given to any person whose political party with which he is enrolled casts at such primary election less than fifteen per centum of the vote cast by such political party for Secretary of State at the last preceding biennial or November election; and in such case such political party shall not be entitled to have the names of any candidates printed upon the official election ballot."

It is admitted that the nominees of the Democratic and Progressive parties did not receive at the primary in question votes equal in number to 15 per cent. of the vote cast by either party at the election in November, 1912, if, by that is meant, that "the party" cast all the votes received by the candidates for the office of secretary of State running upon the respective tickets. This is the construction placed upon the section by the petitioners, and doubtless the construction intended by the legislature. If the contention of petitioners is sound, and it would appear to be so if the section in question can be sustained, a very remarkable situation would ensue. Petitioners alone would be entitled to a place upon the official ballot, and the nominees of the other political parties could only be voted for at the election by the laborious process of writing their names upon the ballot in the booth. This method of voting is not only slow, but requires a considerable degree of education and intelligence. It is also likely to result, through misspelling of names or other error or omission, in partially or wholly disfranchising the voter. It is in my opinion idle to say that a law which imposes such a handicap upon a portion (in this instance more than one-half) of the electors is either reasonable, uniform, or impartial. To say that the elector can still vote, and that it is only a little harder for him to do so, and therefore that he is denied no constitutional right, is a mockery. In crowded precincts the time re-

quired by each voter to write in all the names of his party candidates would alone undoubtedly result in the disfranchisement of many.   Each elector is entitled to express his choice at the election with the same facility enjoyed by any of his fellows.   The constitutional warrant for the enactment of the section in  question must be found, if at all, in section 8, art. 3, which reads:

"Laws shall be passed to preserve the purity of elections and guard against the abuses of the elective franchise."

I am unable to see how section 37 tends in any degree to either preserve the purity of elections or guard against abuse.   It is said its purpose was to stimulate interest in party primaries.   Its effect is to compel the attendance at the primaries of a certain percentage of each political party.   Failure to observe the mandate penalizes the offending party by placing it under a disability with the result that its members suffer a serious impairment of their right to freely exercise the elective franchise.   In his opinion Mr. Justice Bird says:

"The test is, then, whether section 37 destroys the elective franchise or simply regulates it.   If it destroys, it is our duty to declare it void.   If it merely regulates, our duty is to declare it valid and relief from its effects must be found in the legislature."

It is in this position that I am unable to agree with my Brethren.   Under the guise of regulation, it is not competent for the legislature to enact laws which seriously impair the right to the elective franchise.   It is not necessary that the legislation should go to the extent of absolute denial or complete destruction in order that constitutional safeguards may be invoked.   No one would contend that, in the concrete instance before the court, the operation of the act in question is not such as to most seriously impair that right.   As was said by Mr. Justice Campbell, in *Attorney General* v. *Detroit Common Council*, 58 Mich. 216 (24 N. W. 889, 55 Am. Rep. 675):

"There is nothing in the Constitution which permits

the legislature, under the desire to purify elections, to impose any conditions which will destroy or seriously impede the enjoyment of the elective franchise."

See, also, *Dapper* v. *Smith*, 138 Mich. 104 (101 N. W 60). The methods used by parties to select their candidates for office were formerly considered matters of interest to the members of the parties only. Latterly legislatures have undertaken, by means of primary laws, to determine exactly how partisan nominations shall be made. Conceding that this is a proper field for legislative enactment, the power to regulate must certainly be exercised in such manner as will secure to the elector his full and unrestricted right of franchise. The right of all political parties to freely nominate their candidates for office is fundamental.

I am of opinion that section 37 imposes an unlawful and unreasonable restriction upon the right of parties to select candidates, and that it should, therefore, be held unconstitutional and void.

The order denying the mandamus should be affirmed.

McALVAY, J., concurred with BROOKE, J. STEERE, C. J., and MOORE, J., did not sit.