Argued and submitted October 8, 1987, decision of Court of Appeals and judgment of circuit court affirmed March 1, 1988

# LIBERTARIAN PARTY OF OREGON et al,
*Petitioners on Review,*

*v.*

# ROBERTS et al,
*Respondents on Review.*

## (TC 151821; CA A40378; SC S34180)

750 P2d 1147

Carol E. Jones, Hillsboro, argued the cause and filed the petition for petitioners on review.

John A. Reuling, Jr., Assistant Attorney General, Salem, argued the cause for respondents on review.

LENT, J.

Linde, J., concurred and filed an opinion.

## LENT, J.

■ ORS 248.008 and 249.732 specify the requirements that a political organization must satisfy in order to be recognized as a "minor political party."[1] The fundamental requirement is a demonstration of support, either through petition signatures or votes, from approximately five percent of the voting electorate. Plaintiff Libertarian Party of Oregon (LPO) contends that requiring political organizations to demonstrate this level of support in order to qualify as a minor political party is contrary to several provisions of the Oregon and United States Constitutions.[2]

---

[1] ORS 248.008 provides:

"An affiliation of electors becomes a minor political party when either of the following events occur:

"(1) When the affiliation of electors has filed with the Secretary of State a petition with the signatures of at least a number of electors equal to five percent of the vote cast in the electoral district for which the nomination is made for all candidates for Representative in Congress at the last general election. The petition also shall state the intention to form a new political party and give the designation of it. The signatures on the petition shall be certified for genuineness by the county clerk under ORS 249.008. Before circulating the petition, the chief sponsor of the petition shall file with the Secretary of State a signed copy of the prospective petition. * * *

"(2) When the affiliation of electors has polled for any one of its candidates for any public office in the state, county or other electoral district for which the nomination is made, at the last general election, at least five percent of the entire vote cast for Representative in Congress in the electoral district."

ORS 249.732 is worded identically. ORS chapter 248 relates to political parties; ORS chapter 249 relates to candidates for public office.

[2] The complaint, which was filed in October 1984, describes the LPO as "an unincorporated affiliation of electors formed for the purpose of nominating and electing candidates for public elective office in the State of Oregon," and as the recognized state affiliate of the National Libertarian Party (NLP). In addition to the LPO, 13 individuals are listed as plaintiffs. Four of these individual plaintiffs were the LPO's 1984 candidates for statewide offices, and two were the NLP's 1984 Presidential and Vice-Presidential candidates. The remaining individual plaintiffs are described in the complaint as "duly registered voters residing in the State of Oregon" and "desirous of casting their votes effectively for the candidates above named [the other individual plaintiffs] and the LPO in the next general election."

Because the 1984 general election has come and gone, it is doubtful whether there remains a justiciable controversy with respect to the individual plaintiffs. Cf. Oregon Republican Party v. State of Oregon, 301 Or 437, 722 P2d 1237 (1986) (failure of plaintiff to allege that it planned to use a certain scheme for encouraging absentee votes in future elections made question of the scheme's legality nonjusticiable once election had passed). The LPO, however, requests injunctive relief in the form of certifying the LPO as a minor political party "in 1984, and thereafter," and there is nothing in the complaint or the record from which one could infer that the LPO does not intend to nominate individuals for elective office in the future. For these reasons,

The circuit court held that ORS 248.008 and 249.732 were constitutional and denied the declaratory and injunctive relief requested by the LPO. The Court of Appeals affirmed. *Libertarian Party of Oregon v. Roberts,* 85 Or App 450, 737 P2d 137 (1987). We allowed review primarily to address the novel Oregon constitutional issues raised by this case and now affirm the decision of the Court of Appeals and the judgment of the circuit court.

## I.

In order to understand fully the arguments made by the LPO, it is necessary to outline Oregon's statutory scheme for electing individuals to partisan public offices.[3] Within this scheme, there are five routes by which a partisan elective office can be sought: as a write-in candidate or as the nominee of a "major political party," "minor political party," "assembly of electors" or individual electors.[4] We discuss each route in turn.

In order to qualify as a write-in candidate, an individual need do nothing. Ballots contain spaces in which voters may vote for persons not listed on the ballot by writing in the names of those persons. ORS 254.145(1). A write-in candidate for President or Vice-President, however, may have to have voters write in the names of a slate of presidential electors supporting the candidate. *Cf.* ORS 248.355; ORS 249.720(2); ORS 254.135(2) (selection of electors for political party candidates and independent candidates).

A major political party is a political organization whose "candidates for presidential elector have polled at the last general election at least 20 percent of the total votes cast for that office." ORS 248.006. The structure and proceedings of major political parties are subject to substantial state regulation. *See* ORS 248.012 to 248.085; ORS 249.016 to 249.078;

---

we conclude that there is a justiciable controversy with respect to the LPO. The presence or absence of a justiciable controversy with respect to the individual plaintiffs does not affect our resolution of the issues presented by this case.

[3] We do not here intend to set forth an authoritative interpretation of Oregon's election statutes. Our discussion is meant only to place the LPO's constitutional arguments in context. Where the correct interpretation of a statute is not clear, we have assumed, *arguendo,* that the LPO's interpretation is correct.

[4] An "elector" is an individual qualified to vote under Article II, section 2, of the Oregon Constitution. ORS 249.002(3).

ORS 249.160 to 249.200. In particular, ORS 249.016 requires major political parties to nominate candidates only through primary elections conducted by the state.

Unlike a major political party, which is qualified to nominate candidates for any partisan public office, a minor political party must be qualified as such in each electoral district for which it nominates candidates. To qualify as a minor political party in an electoral district, a political organization must demonstrate support from approximately five percent of the voting electorate in that district. The organization can do this in two ways: (1) by obtaining from the electoral district the signatures of a number of electors equal to five percent of the district's vote for congressional candidates at the last general election or (2) by having any of its candidates at the last general election poll in the district a number of votes equal to five percent of the district's congressional vote. ORS 248.008; ORS 249.732. For example, the 1986 statewide congressional vote was 1,031,544. Oregon Blue Book 1987-88 at 401-02. In order to be recognized as a minor political party for statewide offices, a political organization would have to obtain 51,578 (five percent of 1,031,544) signatures or have polled at least 51,578 votes for any of its 1986 candidates for statewide offices. There is no requirement that the signers of petitions be party members or unaffiliated with other parties or have refrained from signing other nominating petitions; the signers need only be registered voters in the appropriate districts.

The election statutes do not regulate the structure or proceedings of minor political parties. To nominate a person for public office, a minor political party need only select that person at a party convention and file a "certificate of nomination."[5] ORS 249.720(3).

An "assembly of electors" may also nominate individuals for partisan public offices by filing a certificate of

---

[5] It is unclear whether a minor political party's nominee must be a member of that party. *Cf.* ORS 249.046 (nominee of major party must be a party member); ORS 249.720(1)(e) (nominee of an assembly of electors or of individual electors must not be a member of a major or minor party). The *"defeated candidate"* statute, ORS 249.048, prohibits a loser of a major-party primary from becoming a candidate for the same office for which the major-party nomination was sought. ORS 249.015 prohibits minor-party candidates from claiming membership in any major political party in their candidacies.

nomination. ORS 249.705. An assembly of electors is a body of at least 250 to 1,000 electors, the minimum number depending upon the offices for which the assembly makes nominations. ORS 249.735(1). The assembly must make the nominations by plurality vote at a convention lasting not more than 12 hours and with the requisite number of electors present. ORS 249.735(2).

Individual electors may nominate a person for partisan public office by signing a certificate of nomination for that person. ORS 249.705. For statewide or congressional offices, the signatures must equal three percent, and for all other offices, five percent, of the vote cast for presidential electors in the electoral district at the last election. ORS 249.740(1). For example, in the 1984 presidential election, 1,226,527 votes were cast in Oregon for presidential electors. Oregon Blue Book 1985-86 at 400. A candidate for a statewide office would have to secure 36,796 signatures (three percent of 1,226,527) in order to be nominated. A congressional candidate would have to secure signatures equal to three percent of the presidential vote in the congressional district in which the candidate intended to run.

A candidate nominated by an assembly of electors or individual electors cannot have been a member of a major or minor political party for 180 days prior to the filing of the certificate of nomination, ORS 249.720(1)(e), which must be filed 70 days before the general election, ORS 749.722(1). There is no requirement, however, that electors who make up an assembly of electors or who individually sign certificates of nomination be unaffiliated with a major or minor political party. There is also no limit on the number of certificates of nomination that an elector may sign, either individually or as part of one or more assemblies of electors.

The names of all nominees of recognized political parties, assemblies of electors and individual electors are printed on the general election ballot. ORS 254.135. Nominees of recognized political parties have their party affiliations printed opposite their names. ORS 254.135(3). Nominees of assemblies of electors and of individual electors may be required to bear the designation "independent," even if they

campaign as candidates of unrecognized political parties.[6] *See* ORS 254.135(3); 249.015; 249.720(1)(e). In addition, candidates who qualify for the ballot, recognized political parties and assemblies of electors have access to voter registration lists and the right to purchase space in the official Voters' Pamphlet. ORS 247.940; 247.945; 251.065. Recognized political parties and their candidates and members also have the exclusive right to use their party's name. ORS 248.010.

Thus, for organizations that wish to nominate candidates for partisan political offices, the election laws present the following consequences: If the political organization lacks sufficient support to qualify its nominees for the ballot, its nominees must run as write-in candidates. The organization and its nominees will also not have access to the Voters' Pamphlet or exclusive use of the organization's name.[7] Nothing in the election laws, however, otherwise limits the ability of the organization or its nominees to campaign for office or limits the ability of voters to cast their ballots for them. If the political organization has sufficient support to qualify its nominees for the ballot through an assembly of electors, it and its nominees are, with two exceptions, treated much the same as a minor political party and its nominees. The exceptions are, first, that nominees of an assembly of electors may be required to appear on the ballot as "independents," and, second, that a political organization, as an assembly of electors, is not entitled under ORS 248.010 to the exclusive use of its name.[8] Finally, if the political organization has sufficient support to qualify as a minor political party, it has privileges similar to

---

[6] Whether nominees of assemblies of electors or of individual electors must bear the designation "independent" on the ballot is unclear. The LPO concludes that they must and argues, for this reason, among others, that these methods of obtaining ballot access are inadequate substitutes for minor-party recognition. Because the LPO's interpretation of the statutes in this respect is irrelevant to our decision, we assume, *arguendo*, that the LPO's interpretation is correct. We emphasize, however, that we express no opinion on whether the statutes require nominees of unrecognized political parties to bear the designation "independent" or on the constitutionality of such a requirement if it exists. Those issues are not before us. The LPO has not raised them and has not alleged that its candidates are qualified or could qualify for the ballot by methods other than minor-party recognition.

[7] The organization will have access to voter registration lists under ORS 247.945.

[8] A political organization could also qualify its nominees for the ballot through the signatures of individual electors, but this appears to be a far more difficult undertaking for a political organization than qualifying its nominees through an assembly of electors and would not entitle it to any greater election privileges.

those of a major political party, except that the organization must qualify as a minor political party in every electoral district in which it intends to nominate candidates. On the other hand, a minor political party is free of the pervasive state regulation to which major political parties are subject.

In 1980, the LPO obtained sufficient signatures to qualify as a minor political party, and its candidates for President, Vice-President and statewide offices were listed on the 1980 general election ballot as Libertarian Party candidates. In 1982, LPO candidates for statewide offices again were listed on the general election ballot as Libertarian Party candidates, apparently because at least one LPO candidate for a statewide office in 1980 received votes equal to at least five percent of the 1980 congressional vote. *See* Oregon Blue Book 1981-82, at 327-28. None of the LPO's 1982 statewide candidates, however, received votes equal to five percent of the 1982 congressional vote, and the LPO lost its status as a minor political party for statewide offices. Since 1982, the LPO has been unable to demonstrate sufficient electoral support to regain statewide minor-party status.

## II.

The LPO argues that ORS 248.008 and ORS 249.732 are unconstitutional, not because the statutes condition minor-party recognition on a showing of electoral support, but because the state has not proven that the level of support required is necessary to further any legitimate state interest. The argument is made under several provisions of the Oregon and United States Constitutions but relies almost exclusively on the "balance-of-interests" analysis employed by the Supreme Court of the United States for resolving ballot access issues under the federal constitution. That analysis attempts to weigh the constitutional interests of candidates and voters against various interests asserted by governments in limiting access to the ballot. The only respect in which the LPO asserts that the Oregon analysis differs is that the Oregon Constitution requires "greater scrutiny" by the courts of the interests of the state, *i.e.,* courts must be more skeptical of the interests asserted by the state in favor of the constitutionality of limits on ballot access.

With respect to its balance-of-interests analysis under Oregon law, the LPO identifies within several provisions of the Oregon Constitution the following rights that it

asserts are "burdened" by ORS 248.008 and ORS 249.732: a right to reform the government (Article I, section 1); rights of conscience (Article I, section 3); a "freedom of expression" right to be a candidate for public office (Article I, section 8); a right to equal privileges (Article I, section 20); a right of assembly (Article I, section 26); and a right to vote (Article II, sections 1 and 8). The LPO asserts that the statutes are unconstitutional because the state has failed to establish the existence of countervailing state interests sufficient to justify the "burdens" placed upon these rights. The LPO stresses in particular that the state has failed to explain why a five-percent showing of electoral support is required in Oregon when almost every other state requires a showing of one percent or less.

The difficulty with this balance-of-interests argument is that it assumes that a court can and should attach values to the conflicting interests asserted, aggregate the resulting values and then compare the aggregates to arrive at a decision concerning the constitutionality of the statutes. A court, however, cannot divine the relative importance of interests absent reference to the constitution itself; it is in the constitution that competing interests are balanced. A court's proper function is not to balance interests but to determine what the specific provisions of the constitution require and to apply those requirements to the case before it. Therefore, we turn to an analysis of the provisions of the Oregon Constitution cited by the LPO.

Article I, section 1, provides, in relevant part: "[T]he people * * * have at all times a right to alter, reform, or abolish the government in such manner as they may think proper."

Article I, section 3, provides, in relevant part: "No law shall in any case * * * interfere with the rights of conscience."

Article I, section 8, provides, in relevant part: "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; * * *."

Article I, section 20, provides: "No law shall be passed

granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

Article I, section 26, provides: "No law shall be passed restraining any of the inhabitants of the State from assembling together in a peaceable manner to consult for their common good; nor from instructing their Representatives; nor from applying to the Legislature for redress of grievances."

Article II, section 1, provides: "All elections shall be free and equal."

Article II, section 8, provides: "The Legislative Assembly shall enact laws to support the privilege of free suffrage, prescribing the manner of regulating, and conducting elections, and prohibiting under adequate penalties, all undue influence therein, from power, bribery, tumult, and other improper conduct."

A cursory examination of these provisions is sufficient to show that none of them, of themselves, requires the state to recognize political parties or list the nominees of political organizations on election ballots. Offering voters a blank ballot on which to write their choice would not limit the right of the people to reform or to abolish the government, would not interfere with rights of conscience, would not restrain the free expression of opinion, would not grant special privileges or immunities, would not restrain the inhabitants of the state from assembling together, would not be inconsistent with free and equal elections, and would not be an abdication of the Legislative Assembly's duty to enact laws supporting the privilege of free suffrage. In no sense would a blank ballot limit the ability of candidates and political organizations to campaign for elective office or limit the ability of voters to vote for anyone they chose. Indeed, although all of these constitutional provisions were in the constitution as adopted in 1859, the practice of printing candidates' names on official state ballots, the "Australian Ballot," was not instituted in Oregon until 1891. *See* Or Laws 1891, pp 18-33; *cf.* General Laws of Oregon, ch 13, § 9, p 699 (Deady 1845-64).

If ORS 248.008 and 249.732 are unconstitutional, it can only be because they create some inequality in the recognition of political parties and in the ballot access that follows

from that recognition on terms not permitted by the constitution. Of the provisions cited by the LPO, only Article I, section 20 ("No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."), and Article II, section 1 ("All elections shall be free and equal."), potentially prohibit such inequality.

In *Ladd v. Holmes,* 40 Or 167, 66 P 714 (1901), this court interpreted the word "equal" in Article II, section 1, from the perspective of voters. An equal election was held to be an election in which "[e]very elector has the right to have his vote count for all it is worth, in proportion to the whole number of qualified electors desiring to exercise their privilege." *Id.,* 40 Or at 178. An election in which unqualified voters were allowed to vote was given as an instance of an unequal election in violation of Article II, section 1.[9] *Id.* Article II, section 1, also prohibits the government from attempting to influence the outcome of elections through intervention on behalf of favored candidates or against disfavored candidates. *See Burt v. Blumenauer,* 299 Or 55, 67, 699 P2d 168 (1985). Such favoritism would be inconsistent with an "equal" election. In this respect, Article II, section 1, can be viewed as a special application of Article I, section 20, which prohibits disparate treatment of "any citizen or class of citizens" based upon impermissible or nonexistent criteria. *See State v. Freeland,* 295 Or 367, 375-76, 667 P2d 509 (1983).

ORS 248.008 and 249.732 make minor political party recognition and its accompanying privileges contingent upon a demonstration of electoral support. The LPO contends that the statutes discriminate against political organizations that cannot make the required demonstration of support. The distinction by magnitude of past support, of course, is made by the statute itself. But statutory classes may reflect and must be examined for correlation with "classes" that exist apart from the statute. *State v. Freeland, supra,* 295 Or at 375. If a purpose of the correlation is discrimination for or against some group identifiable apart from the statute, the statute

---

[9] The LPO contends that voters cannot vote as effectively for candidates whose political affiliations are not labeled or who do not appear on the ballot at all, but that is not an issue of unequal voting strength. A vote for an "independent" or write-in candidate counts for just as much as a vote for a recognized political party candidate.

may nonetheless violate Article I, section 20. *Id.* Underlying the LPO's challenge to ORS 248.008 and 249.732 is the argument that the major political parties have banded together to discourage the growth of rival political organizations by designing ballot access laws that require an unjustifiably high demonstration of electoral support, which effectively limits political party ballot access to the major political parties. In support of this argument, the LPO notes that it is the only party in nearly 40 years to have obtained statewide minor political party recognition. In addition, the LPO asserts that Oregon's ballot access requirements are among the most, if not the most, restrictive in the nation. The inference we are to draw from these assertions is that if the Legislative Assembly had intended to promote the legitimate objectives generally attributed to ballot access limitations—the prevention of "voter confusion, ballot overcrowding, or the presence of frivolous candidacies," *Munro v. Socialist Workers Party,* 479 US 189, 107 S Ct 533, 93 L Ed 2d 499, 505 (1986)—it could have accomplished these objectives by imposing requirements that were less restrictive.

Our function, however, is not to decide whether the Legislative Assembly could have tailored ORS 248.008 and 249.732 to serve more exactly its legitimate objectives, whatever those legitimate objectives may have been. Our function is to ascertain whether a purpose of these statutes is to protect the major political parties from rival political organizations.

The "Australian Ballot Law," enacted in 1891, permitted ballot nominations from "any convention of delegates," "any assembly of electors" or a specified number of individual electors. Or Laws 1891, p 18, § 31. A "convention of delegates" was defined as an organization that had polled three percent of the vote in the last election for the electoral district for which it intended to make nominations; an "assembly of electors" was defined as an assembly of 100 electors from the electoral district for which the assembly intended to make nominations. *Id.* In 1901, the "Australian Ballot Law" was amended in a number of respects, including renaming a "convention of delegates" a "political party" and changing its definition from a political organization polling three percent of the vote in the electoral districts for which it intended to make nominations to an organization polling five

percent, or presenting signatures of electors totaling five percent, of the congressional vote in the electoral districts for which the party intended to make nominations. Or Laws 1901, pp 361-62, § 14. Another law enacted in 1901 had made indirect primary elections mandatory for political parties in cities of more than 10,000 inhabitants but did not apply to nominations by assemblies of electors or individual electors. Or Laws 1901, p 317, § 1. Thus, the purpose for the changes in name and qualifications was to limit the application of the primary law rather than to limit access to the ballot. *See also Ladd v. Holmes, supra,* 40 Or at 180-182. In 1905, the legislature enacted a direct primary election law that applied only to political parties that had polled 25 percent of the congressional vote. Or Laws 1905, ch 1, § 11. The 1901 five-percent requirement for political parties eventually became, in substantial part, the present requirement for minor-party recognition found in ORS 248.008 and 249.732.

Because the requirements for minor-party recognition have remained relatively unchanged since 1901, the limited success of political organizations in achieving minor-party status in recent decades is little, if any, evidence that the purpose of ORS 248.008 and 249.732 is to protect the major political parties from nascent political organizations. The absence of success may just as easily be attributed to an absence of electoral support apart from exclusion from the ballot. This is particularly true in the case of the LPO, which had achieved minor political party status for statewide offices in the 1980 and 1982 general elections but was unable to maintain sufficient electoral support to retain its status. The longstanding requirements for minor-party recognition also undercut the argument that the relative restrictiveness of these requirements is evidence of an improper purpose. The relative restrictiveness is best explained by the failure of Oregon to follow the recent, and largely court-engineered, trend toward easing ballot access restrictions in other states that was initiated with *Williams v. Rhodes,* 393 US 23, 89 S Ct 5, 21 L Ed 2d 24 (1968) (invalidating Ohio laws requiring new political parties to obtain signatures from 15 percent of the voting electorate and to meet numerous additional requirements).

Although a requirement to show electoral support might be so high as to imply a purpose to discourage potential

political rivals, a required showing of support from five percent of the voting electorate is, in the context of Oregon's election laws, insufficient to show this. In election districts where a minor political party is qualified, it has ballot access that is identical to that of a major political party. Had there been a design to restrict ballot access to the major political parties, it is odd that an entirely separate category with identical ballot access privileges would have been created for political organizations that could not satisfy the 20 percent electoral support requirement for major political parties. In addition, the required five-percent showing of electoral support is far below the level of electoral support that would be needed to pose a significant threat to the political dominance of the major political parties, and, by nominating candidates as an assembly of electors, a political organization could have its candidates listed on the ballot (albeit perhaps as "independents") with only a minimal demonstration of electoral support.

Without a more substantial showing by the LPO that the purpose of ORS 248.008 and 249.732 is to discourage the development of political rivals of the major parties, we cannot conclude that these statutes violate Article I, section 20, or Article II, section 1, of the Oregon Constitution.

## III.

The LPO's federal claims do not require extended discussion. In a series of cases beginning with *Williams v. Rhodes, supra,* the Supreme Court of the United States has held that ballot access restrictions "burden" rights of association and voting protected by the First and Fourteenth Amendments to the United States Constitution, and that such restrictions are constitutional only if necessary to further legitimate state interests.[10] In a few decisions, the Court has

---

[10] Originally, the Court employed the "fundamental rights" strand of equal protection analysis, but more recent decisions have relied on associational and voting rights under the First and Fourteenth Amendments without engaging in an equal protection analysis. *Anderson v. Celebrezze,* 460 US 780, 786 n 7, 103 S Ct 1564, 75 L Ed 2d 547 (1983); *see also Munro v. Socialist Workers Party,* 479 US 189, 107 S Ct 533, 93 L Ed 2d 499, 504 (1986).

purported to "closely scrutinize" ballot restrictions, *e.g., Bullock v. Carter,* 405 US 134, 144, 92 S Ct 849, 31 L Ed 2d 92 (1972), but in more recent decisions the Court has held that the state's "important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions," *see Anderson v. Celebrezze,* 460 US 780, 788, 103 S Ct 1564, 75 L Ed 2d 547 (1983). The Court has also held that the state need not demonstrate empirically the need for such restrictions. *Munro v. Socialist Workers Party, supra,* 479 US 189, 107 S Ct 533, 93 L Ed 2d 499, 505-06 (1986).

In *Jenness v. Fortson,* 403 US 431, 91 S Ct 1970, 29 L Ed 2d 554 (1971), the Court upheld Georgia ballot access laws that required candidates other than those nominated by a "political party," defined as a party whose candidate for governor or President received 20 percent of the vote at the last election, to obtain the signatures of five percent of *registered voters.* Oregon only requires signatures from five percent of the voters who voted for Congressional candidates, a much smaller number, and grants automatic ballot access to parties that received only five percent of the vote at the last election, rather than the 20 percent required by Georgia. The LPO's desperate effort to distinguish *Jenness* on the ground that minor-party and independent candidacies have been less successful in obtaining ballot access in Oregon than in Georgia is not persuasive. The LPO does not point to anything in the laws of Georgia or Oregon that should make this so. Without identifying a statutory reason for the discrepancy, we are left with the conclusion that minor-party and independent candidates have been less successful in Oregon because they have had less popular support in Oregon.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

**LINDE, J.,** concurring.

The Libertarian Party of Oregon and some of its potential candidates for elective office sued for a declaratory judgment invalidating the five percent threshold for a "minor political party" under Oregon's election laws and for a mandatory injunction to certify the Libertarian Party as a "valid minor party." ORS 248.008, 249.732. I join the court's opinion deciding that the Party is not entitled to either form of relief. I write only to emphasize that this decision does not establish

the constitutional validity of Oregon's entire scheme of classi-
fying and regulating political organizations and placing nomi-
nees on the ballot.

After a century of experience with elections in which
partisan candidates are nominated and identified as such on
the "Australian" ballot, it may be little known that this was
not the original voting system under the Oregon Constitution.
In answer to questions sent to the litigants by this court, the
Department of Justice provided a very helpful historical sur-
vey of the development before and after 1891, when the names
of candidates were first printed on an official ballot for the
voters' choice, the so-called "Australian ballot." In early prac-
tice as well as in theory, citizens could cast a vote for anyone of
their choice, although political parties could and apparently
did write the names of their candidates on ballots prepared
and distributed for use by their supporters. An 1885 statute
first regulated the process by requiring "tickets" used as bal-
lots to be written or printed on paper obtained from the Secre-
tary of State, on which each party could place a "vignette or
heading, with an appropriate inscription" and the statement
that it represented the "regular ticket of the party." Or Laws
1885, pp 94-95, §§ 35-36. Any existing or new political group
could do so, regardless of its size. *Id.* Six years later, the state
took over the job of preparing a standardized ballot listing the
names of the candidates and their party affiliations, which
allowed each party to nominate one candidate for each public
office to be filled at the election. Or Laws 1891, pp 8-33, §§
1-72. Another 1891 statute permitted each party to elect dele-
gates to its nominating convention by a primary election. Or
Laws 1891, pp 4-7, §§ 1-15.

Obviously it is the use of an official government-
prepared ballot that necessitates legal definition of the per-
sons whose names are to be placed on that ballot, that is to
say, whom the government includes among the recognized
nominees for the office. Before 1891, that was not the govern-
ment's business. In theory, voters could elect anyone they
chose. The person did not have to be a candidate. In theory,
they could draft someone for an office who had no desire for
it—still not an unknown event in Oregon's proliferation of
unpaid local offices. The constitution's democratic theory was

conceived from the perspective of the electors, not of candidates for election, although in practice, of course, it became a contest among candidates and their organized partisans.

These organizations, in turn, were private associations, entitled to the constitutional rights of private associations. The size of a party or other political association, though some might be much larger than others, would not be reflected in their official treatment until the government began qualifying candidates' names for inclusion on the official ballot, and later for inclusion in the official Voters' Pamphlet. This, for the first time, made the size of a "party" or other group "nominating" a "candidate" officially important in advance of the election.

Although the law preserved and still preserves the right of citizens to cast write-in votes for someone other than the persons listed on the ballot, plainly the listed candidates gain a practically unsurmountable advantage not only in convenience but in the apparent official recognition of their candidacy. The ballot shapes the voters' choice in all but the most exceptional circumstances. The choice may further be influenced by the identification of a candidate as the nominee of an organized political party, rather than as an "independent" candidate, in those contests in which that information also appears on the ballot.

The extensive scheme of regulation that has been imposed on political parties has rested on this function of selecting and identifying candidates for those elective offices for which the laws regard partisan elections as appropriate. Political "affiliations of electors" become "minor political parties" when one of their candidates gains five percent of the vote cast for a representative in Congress, ORS 248.008(2), and if its candidates gain 20 percent of the votes cast in a presidential election, the "affiliation of electors" becomes a "major political party," apparently whether the party wishes it or not. ORS 248.006. When a political party crosses that threshold, the laws substantially prescribe its organization, taking over the process by which the party may select its own officers and its nominees for public office by substituting government-administered primary elections and denying the party's own officers any substantial role in the selection of its nominees. ORS 248.015 to 248.380, 249.016 to 249.205.

One might question how far such regulations of party organizations (and exclusion of some potential nominees by reason of party affiliation, ORS 249.046, 249.048) can be justified as preserving elections from "undue influence therein, from power, bribery, tumult and other improper conduct," Oregon Constitution, Article II, section 8, notwithstanding constitutional guarantees of political rights, and how far they can go before they turn constitutionally privileged private associations into regulated instrumentalities of the state's balloting functions.[1] The Libertarian Party cannot and does not raise such issues; its complaint is that it is treated as a private political association when it wants statutory status as a "minor political party." One consequence could be that its nominees would be identified as such on the ballot, like those of other parties, rather than as "independents," a ballot designation implying lack of a nomination and support by a political party. Respondent's memorandum to this court suggests, and the court's opinion recognizes, that the statutes lend themselves to an interpretation that eliminates the difficulty. But the Party's complaint does not encompass the identification of its candidates on the ballot. That possible premise for a claim to be "recognized" as a political party therefore is not before the court for decision.

I concur in the court's decision and opinion.

---

[1] *See, e.g.,* Note, *Are State-Imposed Political Party Primaries Constitutional? The Constitutional Ramifications of the 1986 LaRouche Primary Victories,* 4 J L & Pol 343, 370-78 (1987).